JAMES F. NEWBOLD, and others, trading as NEWBOLD
& SONS *vs.* THE J. M. BRADSTREET & SON, a body
corporate.

*Erroneous Statement in the Daily Sheet of a Mercantile
Agency—General and Special Damages—Proper form of
Instruction—Evidence of the Meaning of an alleged Libel-
lous expression—A Letter offered in Evidence excluded—
Declarations of a Reporter of Mercantile Agency excluded.*

The defendant conducted a mercantile agency, and printed daily for
the benefit of subscribers, among whom were the plaintiffs, a list
of transfers of real and personal property, mortgages &c., called
Bradstreet's Daily Sheet of Changes. On the 15th January, 1878,
the defendant printed in said sheet under the head of " Chattels,"
the words, " Newbold & Sons to J. R. Burns." Whereupon, the
plaintiffs, on the ground that the publication indicated that they
had made a chattel mortgage, which they had not, sued the defend-
ant to recover both general and special damages to their business
as merchants, by reason thereof. HELD:

1st. That the alleged libel contained nothing actionable *per se*, that
being the test as to the right to recover general damages in this
class of cases; and that all proof of general damage to the business
and credit of the plaintiffs, by the publication in the daily sheet,
was properly excluded by the Court below.

2nd. That the proffer by the plaintiffs of evidence as to the acts of
certain merchants, that they had refused to give the plaintiffs credit
or to deal with them, and their reasons or motives for so acting, was
properly refused by the Court below; as the third persons them-
selves should have been called to prove their motives, for the acts
without the reasons or motives therefor, were no evidence against
the defendant, there being nothing to show connection between the
acts of the merchants and the alleged libel, or that they ever saw it,
or knew of its existence.

3rd. That the instruction of the Court below should have been that
upon the pleadings in the cause, there was no sufficient evidence of
any special damage to entitle the plaintiffs to recover; and not, that

under the pleadings and evidence in the cause the plaintiffs were not entitled to recover.

When it is desired to get at the peculiar or extraordinary meaning of language alleged to be libellous, the witness called to show a usage that gives a peculiar significance to the expression employed, should be first asked whether there be any extraordinary or peculiar meaning expressed by the words in question; and if the answer be in the affirmative, he should then state the means and extent of his knowledge upon the subject of the peculiar meaning of the words; and if it appears to be adequate, he may then be asked the question:—What did you understand by the words employed?

The plaintiffs having given in evidence the fact that they had applied to the defendant to have the error in the daily sheet corrected, and that it had been corrected in the daily sheet issued after such application, though not in the way desired by the plaintiffs, a letter of the plaintiffs offered in evidence by them, containing their declarations and statements as to the fact, was properly excluded by the Court below.

Declarations of a reporter of the defendant, in an alleged conversation with a witness called for the plaintiffs, without any evidence of authority to make such declarations, were inadmissible.

APPEAL from the Court of Common Pleas.

The case is stated in the opinion of the Court.

The special damage laid in the declaration was as follows:

And the plaintiffs say: That they had business dealings with certain merchants in New York, doing business under the style of Burgess & Goddard, and the plaintiffs enjoyed good credit with them, and were indebted to them in a large sum of money, and the plaintiffs had sent them their promissory notes for the amount of said indebtedness, payable to the order of said Burgess & Goddard, as had been usual with the plaintiffs in their dealings with them; and the said Burgess & Goddard, in consequence of the aforesaid libel, suspecting the credit of the plain-

tiffs, and distrusting their ability to pay their debts, caused the aforesaid notes of the plaintiffs. to be offered for sale in the City of Baltimore, after they were endorsed by the said Burgess & Goddard, "without recourse," whereby the said plaintiffs were greatly injured in their credit and reputation as solvent merchants.

And the plaintiffs say: That they had business dealings with certain merchants doing business in New York, under the style of Mayer Brothers, and had good credit with them, and the said Mayer Brothers, in consequence of the aforesaid libel, refused to sell to plaintiffs goods. upon credit, as they had been accustomed to do, and required payment in cash.

And the plaintiffs say: That they had dealings with the Plume & Atwood Manufacturing Company, of New York, and had good credit with said company, and that said Plume & Atwood Manufacturing Company, of New York, in consequence of said libel, drew a draft on plaintiffs for the immediate payment of a large sum of money which the plaintiffs were compelled to make immediate payment thereof, instead of having a period of credit for the payment of the same, according to what had theretofore been usual in the dealings between them and said company.

And the plaintiffs say : That they had business dealings with certain merchants in Pittsburg, in the State of Pennsylvania, doing business under the style of Duncan & Son, and had good credit with them, and said Duncan & Son, in consequence of said libel, refused to sell goods to plaintiffs on credit, as they had theretofore been used to do, and demanded immediate payment of a sum of money which the plaintiffs owed them.

And the plaintiffs say: That they had business dealings with the Rochester Tumbler Company, and had good credit with it, and the said Rochester Tumbler Company in consequence of the said libel, refused to sell them goods

upon the usual terms of credit, which had been accustomed between it and the plaintiffs.

*First Exception.*—At the trial the plaintiffs, to maintain the issues on their part, called. David M. Newbold, one of the plaintiffs, who testified to the facts set forth in the opinion of the Court, as to the business and credit of the firm and the mercantile agency of the defendant to which they were subscribers, and offered in evidence Bradstreets' Daily Sheet of Changes of the 15th January, 1878, in which, under the head of "Chattels," were the words: "Newbold & Sons to J. R. Burns." He further testified, that on his complaint of the erroneous and injurious statement to an agent of the defendant, the words following appeared in the Daily Sheet of the 17th January, 1878, which the witness produced:

*Note.*—"Newbold & Sons to J. R. Burns," appearing on Daily Sheet of January 15th, 1878, under the head of Chattels, was simply a release of a lien upon chattels previously given by J. R. Burns to Mess. Newbold & Sons.

The witness further testified to the refusal of the defendant to correct the first statement, by an advertisement in the daily papers.

The plaintiffs' counsel then asked the following question of witness: Can you state whether there is any usage with the J. M. Bradstreet and Son Company, which gives a meaning to the words in the paper offered in evidence, which are as follows: "Chattels, Newbold & Sons to J. R. Burns?" and the witness said, there was such an usage. The plaintiffs' counsel then asked the question: "State what is that meaning?" The defendant's counsel objected to the question. Thereupon, the Court (BROWN, J.) ruled that the witness could not answer the question, unless he stated how he knew the meaning of the words. The witness stated, that his firm had been and was a subscriber to the Bradstreet Agency, as he had already stated; that he had been in the habit of reading this paper, which

was at the time of the publication issued daily; that he knew some persons who had given chattel mortgages, and all of these chattel mortgages were published under that head; that there were from five hundred to a thousand subscribers to the paper in the City of Baltimore, that he knew personally from fifteen to twenty of them, and that he in this way had acquired a knowledge of the meaning of the words. The Court ruled that the knowledge of the witness was not sufficient to entitle him to answer the question, and overruled the question, and refused to permit the witness to answer the same. The plaintiffs excepted.

*Second Exception.*—The plaintiffs, by their counsel, then asked the witness the following question: "What did Mr. Cole, the agent of the defendant, say in reference to your complaint, in which you stated, that the paper had stated you had given a chattel mortgage; state particularly, whether he said anything about the meaning of these words?" Witness said, "I asked him what he meant by publishing that Newbold & Sons had given a chattel mortgage, and said, that Newbold & Sons had given a release to a chattel mortgage; and he said that he would send to the Record Office and see if it was properly reported; he said that the report had come to the office, as he had published, and he would send and see whether plaintiffs had given a chattel mortgage." Plaintiffs' counsel then asked this question; "Look at the words in the paper offered in evidence, which are as follows: 'Chattels, Newbold & Sons to J. R. Burns,' and state whether you know of any usage which fixes a definite meaning to these words?" And the witness said: "That there was such a usage." The plaintiffs' counsel then asked this question; "To whom does this usage extend?" The defendant objected to the question. The Court decided to hear the answer of the witness, before ruling upon it. Thereupon, the witness stated: "The paper

conveys information to the subscribers; we have been receiving the paper and seeing the chattel mortgages put under that head; we had been receiving the paper about two years prior to 1878." The Court thereupon ruled out the answer of the witness, and refused to permit it to go in evidence to the jury. The plaintiffs excepted.

*Third Exception.*—The plaintiffs' counsel then asked the witness the following question: "State whether you know the general and usual and ordinary meaning which those words had among persons who were the subscribers to the Bradstreets' Agency?" The defendant objected to the question, and the Court refused to permit the witness to answer it. The plaintiffs excepted.

*Fourth Exception.*—The plaintiffs then asked the witness the following question: "State whether you know the meaning of the said words, 'Chattels—Newbold & Sons, to J. R. Burns,' as used in the paper offered in evidence?" The defendant objected to the question, and the Court ruled as follows: "If the witness has any knowledge on the subject which he has not already stated, he is at liberty to state it fully, but he is not at liberty in his reply to give any evidence which has been ruled by the Court to be inadmissible." The witness thereupon said, "Of course I know the meaning; one of the reasons is, that the instrument referred to in the publication, is a chattel mortgage, and it is under the head of chattels; as to another reason for knowing the meaning, I do not know that I could define it any other way than this; we have always accepted it, and acted upon it in our business as having that meaning; I think I have stated about all I can base my conclusions upon." The Court then ruled out the said answer of the witness, and refused to permit it to go in evidence to the jury. The plaintiffs excepted.

*Fifth Exception.*—The plaintiffs' counsel then asked the witness the following question: "State what is the meaning of the said words?" Defendant objected, and the

Court refused to permit the witness to answer it. The plaintiffs excepted.

*Sixth Exception.*—The plaintiffs' counsel then asked the witness the following question: "State whether the publication in Bradstreets' Daily Sheet of Changes, which has been offered in evidence, had any effect on your business?" Defendant objected to the question, and the Court sustained the objection, and refused to permit the witness to answer it. The plaintiffs excepted.

*Seventh Exception.*—The plaintiffs then proposed to offer in evidence the following letter, which had been written by them to the defendant, and which defendant produced on notice to that effect from the plaintiffs:

BALTIMORE, Jan. 17, 1878.

Mess. J. M. Bradstreet Son & Co.,

Gentlemen:—We question very much whether a correction of your blunder in reporting us as giving a chattel instead of a release, will undo the damage done; it is due us that you make the correction through the public press, and let it appear in the morning, and look to it that the error is not repeated through your weekly report; a failure to rectify the error as suggested, and a repetition of mistake by to-morrow, we will institute suit at once for damages. The writer has just returned from the Record Office, where he finds the release, marked plainly "A Release of Mortgage;" your knowledge of our means and standing should have been sufficient to know that we would not give a chattel mortgage, and made you hesitate before publishing so damaging a report.

Very truly, yours,

NEWBOLD & SON.

But the defendant objected to the admission of the letter in evidence, and the Court sustained the objection, and refused to permit it to be read in evidence to the jury. The plaintiffs excepted.

APRIL TERM, 1881. 45

Newbold & Sons vs. The J. M. Bradstreet & Son.

*Eighth Exception*—The plaintiffs then asked the witness the following question : "State whether the publication of the words mentioned had any effect on your mercantile credit?" but the defendant objected to the question, and the Court sustained the objection, and refused to permit the witness to answer the question. The plaintiffs excepted.

*Ninth Exception.*—The plaintiffs then proposed to prove by said witness, that at the time of the publication referred to in the previous bills of exception, they enjoyed good credit with certain merchants in New York, known as Burgess & Goddard, and that plaintiffs were indebted to them in a large sum of money, and plaintiffs sent them their promissory notes for the amount which they owed them, payable to the order of said Burgess & Goddard, and that after said publication, Burgess & Goddard caused the said notes to be offered for sale, endorsed " without recourse " by said Burgess & Goddard, and that in consequence thereof, the plaintiffs were greatly injured in their credit as merchants ; but defendants objected to the admission of said testimony, and the Court sustained the objection, and refused to permit the evidence to be given to the jury. The plaintiffs excepted.

*Tenth Exception.*—The plaintiffs then offered to prove by the same witness similar facts as set forth in the last exception, in reference to their dealings with Mayer Brothers, of New York, and with the Plume & Atwood Manufacturing Company, of New York, and with Duncan & Son, of Pittsburg, and with the Rochester Tumbler Company, of Rochester, Pennsylvania—none of them having an office in Maryland. But the defendant objected to the evidence, and the Court sustained the objection, and refused to permit the evidence to be given. The plaintiffs excepted.

*Eleventh Exception.*—The plaintiffs then offered in evidence by ——— Johnson, that in January, 1878, he was

a merchant in the City of Baltimore, engaged in the coffee trade, and that he had been a merchant many years at that time ; that he was a subscriber to the Bradstreet Agency of the defendant; that he received the "Daily Sheet of Changes," issued by the defendant; that he received and read the issue of January fifteenth, 1878; that he had been a subscriber to it for years; that he read it for the purpose of obtaining information, to be used in conducting his business, and that he understood it; that there were several hundred subscribers in the City of Baltimore to the Bradstreet Agency; that witness knew a good many of them. Plaintiffs then placed in the hands of the witness the "Daily Sheet of Changes" aforesaid, of January fifteenth, 1878, and asked him the following question: "Look under the word Chattels in the paper you have in your hand, and state whether you know what the words, 'Newbold & Sons, to J. R. Burns,' mean?" Defendant objected to the question, and the Court sustained the objection, and refused to permit the witness to answer it. The plaintiffs excepted.

*Twelfth Exception.*—The plaintiffs then made the following offer of evidence: The plaintiffs offer to prove by the witness, Johnson, that the words, "Newbold & Sons to J. R. Burns," in the paper called "Bradstreet's Daily Sheet of Changes," meant that Newbold & Sons had given a chattel mortgage. Thereupon, instead of passing on the offer, as stated, the Court requested the counsel to propound to the witness the questions he desired to ask, and stated, the Court would then decide whether the questions were admissible. The plaintiffs then asked the following question of the witness: "State what is the meaning of the words, 'Newbold & Sons to J. R. Burns,' under the head 'Chattels,' in the paper which you hold in your hand?" Defendant objected to the question, and the Court sustained the objection, and refused to permit the question to be answered. The plaintiffs excepted.

Newbold & Sons *vs.* The J. M. Bradstreet & Son.

*Thirteenth Exception.*—The plaintiffs then asked the witness the following question: "State what you understood to be the meaning of the said words, when you read them in the said paper?" Defendant objected to the question, and the Court sustained the objection, and refused to permit the witness to answer it. The plaintiffs excepted.

*Fourteenth Exception.*—The plaintiffs then asked the witness the following question: "State what would be the effect on a merchant's credit, to give a mortgage of his chattels?" Defendant objected to the question, and the Court sustained the objection, and refused to permit the witness to answer the question. The plaintiffs excepted.

*Fifteenth Exception.*—The plaintiffs then offered in evidence, by Wm. R. Johnston, that in January, 1878, he was agent for the O'Hara Glass Company, of Pittsburg, for the Rochester Tumbler Company, for Adams & Company, of Pittsburg, Campbell, Jones & Company, of Pittsburg—both of these firms being in the glass business—and for the Central Glass Company, of Wheeling; that he knew the plaintiffs, and had often dealt with them; that at that time their credit was good, and that he would have been glad to sell them anything. The plaintiffs then asked the witness the following question: "State whether you had any verbal communication from the J. M. Bradstreet & Son Company, in reference to the credit of Newbold & Sons, on or about the 15th January, 1878?" Defendant objected to the question, but the Court, before deciding the objection, determined to hear the witness. The witness thereupon said: "I had a conversation with a reporter of the company, who often came to my office to get information as to the trade," and was proceeding with his answer, when the Court ruled his answer to be inadmissible, and refused to permit him to give any further answer to the question. The plaintiffs excepted.

*Sixteenth Exception.*—Whereupon the plaintiffs closed their testimony, and offered the two following prayers, to wit:

1. If the jury shall find from the evidence, that the defendant published the paper offered in evidence, and that the words therein, "Chattels, Newbold & Sons to J. R. Burns," meant, that the plaintiffs had made a chattel mortgage, and that the making of a chattel mortgage was an act which would be injurious to the credit of the plaintiffs, as merchants, and that the plaintiffs were merchants in the City of Baltimore, in good credit, then the plaintiffs are entitled to recover.

2. The jury are instructed, that it is their province to construe the words in the printed sheet, offered in evidence, which are as follows: "Chattels, Newbold & Sons to J. R. Burns."

And the defendant offered the prayer which is stated in the opinion of the Court.

The Court rejected the plaintiffs' prayers, and granted the defendant's prayer. The plaintiffs excepted, and the verdict and judgment being for the defendant, the plaintiffs appealed.

The cause was argued ·before BARTOL, C. J., GRASON, ALVEY, ROBINSON, IRVING and MAGRUDER, J.

*William Shepard Bryan*, for the appellants.

*Sebastian Brown*, for the appellee.

ALVEY, J., delivered the opinion of the Court.

This is an action for what is supposed to be a libel published by the defendant, a corporation, of and concerning the plaintiffs in their business as merchants.

The plaintiffs are merchants in the city of Baltimore, dealers in glassware, and the defendant conducts a Mer-

-cantile Agency in the same city, the object of which is to furnish information to subscribers, respecting the credit and commercial standing of merchants. It appears that the plaintiffs had been for two years prior to January, 1878, subscribers to this agency. And in addition to furnishing information, as from an intelligence office, of the standing and credit of merchants, the defendant, for the benefit of its local patrons, printed and published a daily sheet or circular, under the title of " Bradstreets' Daily Sheet of Changes," devoted to showing the changes and transfers of titles to real and personal property, mortgages, judgments, &c., in the city of Baltimore. This sheet was circulated only among the subscribers to the agency in the city, numbering, according to the proof, from five hundred to one thousand. In the daily publication of January 15th, 1878, which contained separate divisions or headings, designated " Mortgages," "Chattels," "Assignments," " Deeds," " Releases," " Judgments," &c., under the heading " Chattels," occurred the following : " Newbold & Sons to J. R. Burns," without any thing more in respect to that entry; and the plaintiffs allege that the meaning of the entry was, and that it was so understood among the subscribers to the agency, that the plaintiffs had made a chattel mortgage to J. R. Burns. The declaration contains averments of both general and special damages to the plaintiffs, in their business as merchants, by reason of the publication. The case was tried upon the general issue plea of not guilty of the wrongs alleged.

In the course of the trial there were sixteen bills of exception taken by the appellants, all but the last relating to questions of evidence. The Court finally granted an instruction, that under the pleadings and evidence in the cause, the plaintiffs, the present appellants, were not entitled to recover.

By the first exception it is shown, that in the examination of one of the plaintiffs as a witness, counsel asked him to state whether there was any usage with the defendant, which gave meaning to the words, " Chattels, New-' bold & Sons, to J. R. Burns," as published in the printed sheet of the 15th of January, 1878; and the witness replied that there was such an usage. Whereupon, the witness was then requested to state what was the meaning of the words. To this the counsel of the defendant objected, and the Court ruled that the witness could not give his understanding of the meaning of the words, unless he first showed how he had acquired knowledge of the meaning.

The witness then stated that his firm had been a subscriber to the agency; that he had been in the habit of reading the daily publication in the form in which it was published on the 15th of Jan., 1878; that he knew some persons who had given chattel mortgages, and all of those mortgages were published under that head, that is to say, " chattels;" and that he in that way had acquired knowledge of the meaning of the words in question. But the Court was of opinion that the means of his knowledge were not sufficient to enable him to answer the question, and accordingly excluded the answer.

The second exception presents substantially the same question as the first, though in slightly different form. What we say in regard to the first will equally apply to the second.

The general rule doubtless is, that the ordinary popular meaning or sense of the language alleged to be libellous is to be taken to be the meaning of the publisher; but a foundation may be laid for showing another or a different meaning. And so where the language is of doubtful meaning or import, or where it fails to convey any explicit meaning without the aid of extrinsic circumstances. In such cases, something may have previously passed, or

some habit or usage may have obtained, that gave peculiar meaning or significance to the expressions employed. When, therefore, it is desired to get at this peculiar or extraordinary meaning of what is alleged to be libellous, the witness should be first asked whether there be any extraordinary or peculiar meaning expressed by the words in question ; and if the answer be in the affirmative, he should then state the means and extent of his knowledge upon the subject of the peculiar meaning of the words ; and if it appears to be adequate, he may then be asked· the question, "What did you understand by the words employed?" This seems to be the settled formula in such cases. *Humphreys vs. Miller,* 4 *C. & P.,* 7 ; *Daines vs. Hartley,* 3 *Exch.,* 200, 206 ; 2 *Greenl. Ev., sec.* 417. It is the same mode of proof as in the cases of libel published in a foreign language, or in cipher ; in each of which cases, the witness must first establish to the satisfaction of the Court that he understood the language, cipher, or symbol employed, before he is allowed to give to the jury his understanding of the libel. This is to prevent the jury being misled, whose duty it is to determine not only the application of the alleged libel to the plaintiff, and to his trade or business, but its real sense and meaning, and whether in point of fact, the construction put upon the words by the averment of the plaintiff is borne out and supported by the evidence ; for if the words be susceptible of a harmless meaning, it is incumbent upon the plaintiff to show, both by averment and evidence, that they were used and understood in a libellous and not in a harmless or innocent sense. *Homer vs. Taunton,* 5 *H. & N.,* 663 ; *Solomon vs. Lawson,* 8 *Q. B.,* 823 ; *Hemmings vs. Gasson, El., Bl. & El.,* 346 ; *Goldstein vs. Foss,* 4 *Bing.,* 489.

Now, in this case, we think there was a sufficient foundation laid for the question to the witness, as to what was the meaning of the words used in the alleged libel. The

witness had been for sometime a subscriber to and reader of the daily publication, and he had known instances of chattel-mortgages having been placed under the heading "chattels." This entitled him to say, what he understood to be the meaning of the words in question; it being for the jury to determine upon the whole evidence, whether his understanding of the meaning of the words was correct or not. We think, therefore, the Court was in error in excluding the question, and in not allowing the answer of the witness to go to the jury. And the same ruling should have been made upon the offers set out in the eleventh and twelfth exceptions. But as to the third, fourth, fifth and thirteenth exceptions, relating to the same subject-matter as those just mentioned, the offers being in the naked form, disconnected from any previous foundation as to the witness's knowledge, we think there was no error in the rulings thereon.

And having determined this question of evidence, we shall, in the further consideration of the case, assume the evidence to be in, and that it clearly established the fact that the meaning of the words charged as libellous is, according to the plaintiffs' averment, that the plaintiffs had made a chattel-mortgage to J. R. Burns. Taking this to be the meaning, and the plaintiffs can insist upon no other or larger meaning, (*Barhams' Case*, 4 *Co.*, 20; *Goldstein vs. Foss*, 4 *Bing.*, 489; *Williams vs. Gardner*, 1 *M. & W.*, 249; *Broome vs. Gosden*, 1 *C. B.*, 732; *Williams vs. Slott*, 1 *Cr. & M.*, 689; *Sellers vs. Tile*, 4 *B. & Cr.*, 655,) it is clear, we think, that the alleged libel contains nothing that is actionable *per se;* that is, from which the law would infer damage, as being *necessarily* occasioned by the publication. That is the test, as we understand the authorities, as to the right to recover general damages, in this class of cases. *Townsh. Sl. & Libel, secs.* 146 *to* 148, *and* 188; 2 *Greenl. Ev., secs.* 254, 256, and 420, and the authorities there cited. To say

or publish of a merchant any thing that imputes insol-
vency, inability to pay his debts, the want of integrity in
his business, or personal incapacity or pecuniary inability
to conduct it with success, is slanderous or libellous *per se,*
if without justification, and general damages may be
recovered. Such publication *necessarily,* in legal contem-
plation, tends to injure the credit and standing of the
party of whom it is made. But we have been referred
to no case, and have been able to find none, in which it
has been held, that to say of a merchant simply, that
he has made a chattel-mortgage, without any thing more,
as to amount, subject of the mortgage, or the occasion
of it, is libellous or slanderous *per se,* and that damage
therefrom is necesarily inferred. We think no such *legal*
inference can, in reason, be indulged. Chattel-mort-
gages, as well as the pledge of stocks and other securi-
ties, may be made by merchants and others without giv-
ing rise to any *legal* inference or presumption of insol-
vency, or that such an act will *necessarily* tend to impair
or injure the credit and standing of the mortgagor or
pledgor. Indeed, we suppose it would be alarming to
merchants and tradesmen to learn otherwise.

All proof therefore of general damage, such as that
stated in the sixth, eighth and fourteenth bills of excep-
tion, was properly excluded. It could only have been
offered in case the libel were actionable *per se;* but not
when it is only actionable with respect to such special
damage as may be alleged. *Dicken vs. Shepherd,* 22 *Md.,*
399, 416; *Dixon vs. Smith,* 5 *H. & N.,* 450.

Where the alleged libel is only actionable in respect to
special damages, it must appear to be of a character that
the special damage alleged may be the *natural and proxi-
mate,* though not the *necessary,* consequence of the publica-
tion. 2 *Greenl. Ev.,* sec. 420; *Townsh. Sl. & Libel,* sec.
197, and notes to that section. The special damage must
be proved as laid, and any substantial variance between

the allegation and proof will be fatal. It must also appear to be the natural and immediate consequence of the defendant's wrongful act; and if the special damage is alleged to consist in the refusal of a third person to deal with the plaintiff, or to give him credit, or in the action of any third person in enforcing obligations, evidence is not admissible of the declarations of such third person as to his reason or motive for so acting; the third person himself must be called to prove his motive; for the act without the reason or motive therefor is no evidence against the defendant. *Tilk vs. Parsons,* 2 *C. & P.,* 201; *Tunnicliffe vs. Moss,* 2 *C. & K.,* 83; *Dixon vs. Smith,* 5 *H. & N.,* 450; *Dicken vs. Shepherd,* 22 *Md.,* 415; 2 *Stark. on Sl. & Lib.,* 57, 58.

Now, in this case, the alleged libel not being actionable *per se,* but only in respect to the special damage alleged, it is quite clear, upon the principles we have just stated, that the offers of proof of special damage, contained in the ninth and tenth exceptions, were not admissible, and therefore properly excluded. There is no evidence whatever to show any connection between the acts of the parties named in those exceptions and the alleged libel, or that they ever saw it, or knew of its existence. Such evidence could furnish nothing more than a foundation for a mere conjecture as to the reasons upon which the parties acted.

We think there can be no question as to the correctness of the ruling stated in the seventh exception. The plaintiffs had already given in evidence the fact that they had applied to the defendant to have the error in the publication corrected, and that it had been corrected, in the publication next after such application, though not in the way desired by the plaintiffs. We know of no principle upon which the plaintiffs' declarations and statements contained in the letter offered, can be made evidence in their own favor, in a case like the present. It was, we think, properly excluded.

Newbold & Sons *vs.* The J. M. Bradstreet & Son.

Nor was there any error in excluding the evidence embraced in the offer as stated in the fifteenth exception. The declarations of a reporter for the defendant, without any evidence of authority to make such declarations, were clearly inadmissible, and the Court could not have done otherwise than exclude them.

Upon careful examination of the whole record we find no evidence whatever of the special damage laid in the declaration. And as the supposed libel is not actionable *per se,* the prayers offered by the plaintiffs were properly refused. The instruction given by the Court, at the instance of the defendant, was defective, inasmuch as it left the matter uncertain, whether the defect or failure of the plaintiffs' case was to be found in the pleadings or in the evidence. There was no case, however, for the jury, and the instruction should have been, that, upon the pleadings in the cause, there was no sufficient evidence of any special damage to entitle the plaintiffs to recover.

Upon the whole case, as disclosed by the record, we agree with the Court below that the plaintiffs were not entitled to recover, and we shall therefore affirm the judgment, notwithstanding the errors to which we have referred.

*Judgment affirmed.*

(Decided 30th June, 1881.)