(Decided 13th January, 1893.)

---

JOHN W. AVIRETT *vs.* STATE OF MARYLAND.

*Criminal law—Act of 1892, ch. 506—Practice in Court of Appeals—Libel—Indictment—Demurrer—General verdict of Guilty—Drawing Grand jury—Waiver of Appeal.*

When an appeal is taken in a criminal case, under the Act of 1892, ch. 506, which provides that the parties to criminal proceedings shall be entitled to bills of exception, in the same manner as in civil proceedings, and appeals from judgments in criminal cases may be taken in the same manner as in civil cases, both the exceptions and the judgment upon the demurrers to the indictment are open for review in the appellate Court.

Avirett *vs.* State.

A newspaper article contained the following: "Political pulls as a preventative of the purgation of the city. The mighty and sudden zeal of the organ of the Court house ring for the purgation of this city from the dens of infamy and vice which pollute it, is a matter of such surprise to so many that it cannot pass without comment. Cordially as the Times welcomes each and every recruit in the cause of law and order * * * it cannot help applying to our own situation the words of the New York Herald upon the same subject: 'You have noticed, perhaps, that no excise cases are prosecuted nowadays. There is the broken law, there is the man who broke it; but the law is a dead letter, and the offender goes scot free. There is no reason why the public prosecutor should not handle these cases, but the fact is he does nothing of the kind, and apparently does not propose to. Why not? Was he forced to agree, as a condition of his election, not to enforce the law? Did he make a bargain when results were hanging by a thread, and is it that which holds back his hand? There is at least ground for suspicion, since nothing has been done, or is being done, or is likely to be done?' We will never have legislation at Annapolis in favor of restrictive liquor laws, and we will never have these laws enforced at home, until the public's servants in the Legislature and the Court house, cease their alleged covenanting with hell and bargaining with the devil in the form of the divekeepers for the sake of their well known, oft proven, and never denied political power." HELD:

That the article, was not on its face, a libel on the Judge who was accustomed to try the liquor cases in the Court house, and could not, by any inducement, *colloquium*, or innuendo be made to include him, as it was applicable only to the State's attorney.

The article not being a libel on the Judge, the clerk or the sheriff, the association of their names in the indictment with the name of the State's attorney to whom the language was applicable, does not bring them within the words or the meaning of the libelous article.

Where a demurrer is filed to each count of an indictment, and all, save one, are erroneously overruled, a general verdict of guilty must be set aside. it being impossible to determine upon which count it was rendered.

Section 7 of Article 51 of the Code provides that "it shall be the duty of the Judge of the Circuit Court for each of the counties * * * in the presence of such practising members of the bar of

Avirett *vs.* State.

said Court as shall think proper to attend,—notice of the time and place having been first given to said bar through the criers of said Courts,—to proceed to select from the lists last furnished by the clerks of the County Commissioners * * * * * and from the poll-books of the several election districts of said counties, that shall be returned and filed in the clerk's office of said Court after any general election that may be last held previously to such selection, a panel, to consist of the names of two hundred persons * * * to be fairly and impartially selected by the said Judge." Section 5 of Article 88 of the Code of 1860 provides that the sheriff shall make oath that he will "not summon or return as a juror any person who may have been recommended or requested to be returned by another person;" and section 11 of Article 51 of the Code of 1888 enacts that "the name of no person whom the sheriff is forbidden to summon as a juror, shall be selected and placed upon the panel or list from which the drawing is to be made." It appeared in evidence that the Judge had directed the crier to notify the members of the bar that on March 19th, 1892, he would proceed to draw the jury for the April term of Court; that upon the day named, "he went to the Clerk's office with a list of two hundred names; that said list had previously been made out by him from names of persons that he knew and from names that had been suggested to him by different persons in the different districts of the county, but was chiefly composed of names of persons that had previously been in the box, but had not been drawn out; that some of the names had been suggested by different members of the bar; * * * that he announced that he was about to draw the jury; that if there were any objections to any of the names he would be glad to hear them; that he then read from the list previously prepared by him, the two hundred names; * * * * that the names of the two hundred were selected from the list previously made by him; that no reference was at that time made to the poll-books or to the list furnished by the Clerk of the County Commissioners, except that a reference was made to the poll-books to ascertain the correct spelling of one of the names, and to ascertain whether another person on said list was twenty-five years of age; * * * * and that all of the two hundred names placed in the box appeared upon the poll-books of the several election districts of Alleghany County, as were filed in the Clerk's office of said Court after the last general election held previously to said drawing, but some of said names did not appear upon the list of tax-payers filed by the Clerk of the County Commissioners." From the list of names thus made up the grand jury was selected. HELD:

Avirett *vs.* State.

That said list of names was not duly selected in confirmity with, and according to the spirit and intent of, the law, but was, on the contrary, a wide departure from its requirements; and the jury drawn from said list was not a legal body.

Pending a motion to strike out a judgment of the 24th of May, 1892, imposing fine and imprisonment on the traverser, he entered an appeal on the 15th of July, 1892, from a previous judgment on the demurrers to the indictment, and from the finding and judgment on the issue made upon the first plea in abatement. After the 15th of July testimony was taken, and a hearing was had on the motion to strike out the judgment of the 24th of May. HELD:

That the appeal taken on the 15th of July could not be treated as having been waived by the taking of testimony and having a hearing on the motion to strike out the judgment of the 24th of May.

APPEAL from the Circuit Court for Alleghany County.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., ROBINSON, BRYAN, PAGE, FOWLER, and McSHERRY, J.

*Ferdinand Williams,* and *A. Hunter Boyd,* (with whom were *W. C. Devecmon, J. N. Willison,* and *R. T. Semmes,* on the brief,) for the appellant.

*John Prentiss Poe, Attorney-General,* for the appelpellee.

McSHERRY, J., delivered the opinion of the Court.

The appellant was indicted by the grand jury of Alleghany County for libel. There are five counts in the indictment. To every count a demurrer was filed. The demurrers were overruled and thereupon three pleas in abatement were pleaded. To the second and third the State demurred. The first was traversed and issue was

joined upon the traverse. The Court below sustained the demurrer of the State, and found against the traverser upon the issue raised by the traverse of the first plea in abatement. The appellant then, under *sec. 7, Art. 75, of the Code,* entered a plea of not guilty, without waiving his demurrers, and after some further proceedings had been taken, he submitted the case to the Court, under the circumstances set forth in the record, and a verdict of guilty was thereupon entered, and a sentence of fine and imprisonment was shortly thereafter imposed. A motion was immediately made to strike out the judgment, and testimony, which is contained in a bill of exception found in the record, was taken in open Court. The motion was denied, and on the seventeenth day of September, 1892, an appeal was taken from the refusal of the Court to strike out the judgment. On the fifteenth day of the preceding July an appeal had been entered from the finding and judgment on the issue made upon the first plea in abatement, and from the judgment on the demurrers to the indictment. The case has been brought into this Court by an appeal, and not by petition as upon a writ of error, and the question which confronts us at the very threshold is whether, upon that appeal, the demurrers to the indictment are open for examination?

When the *Act of* 1872, *ch.* 316, allowed for the first time an appeal in criminal cases, it provided that the appeal should be taken before sentence was imposed, and it has been repeatedly held by this Court that upon an appeal under that statute a demurrer to the indictment could not be considered, and that the only questions which could be examined were those presented by bills of exception. As a result it was possible that the same case might be brought here twice—once on appeal before sentence to review the lower Court's rulings on questions presented by bills of exception; and once after

Avirett *vs.* State.

sentence by petition as upon a writ of error to review only specifically assigned errors appearing on the face of the record. Under the *Act of* 1872, as amended by the *Acts of* 1884, *ch.* 132, *and* 1886, *ch.* 169, an appeal in a criminal case did not bring up any judgment upon a demurrer; and upon a writ of error a review of the questions raised by exceptions was not permitted. It followed from this that a judgment on demurrer and exceptions to rulings made during the progress of the trial, could not possibly be brought into this Court at the same time and upon the same record in a criminal cause. But this was not so in civil cases. On the contrary, in the latter an appeal was premature until after final judgment. When such a judgment had been entered the appeal brought up both the exceptions and the demurrers, or the demurrers alone if there were no exceptions. *Tucker, et al. vs. The State, &c.,* 11 *Md.,* 322. In this condition of the law, with this marked difference existing between the practice in civil and in criminal proceedings on appeal, the *Act of* 1892, *ch.* 506, was passed. It provides that "the parties to criminal proceedings shall be entitled to bills of exception, in the same manner as in civil proceedings, and appeals from judgments in criminal cases may be taken in the same manner as in civil cases; but no appeal in a criminal case shall stay execution of sentence unless the counsel for the accused shall make oath that the appeal is not taken for delay." This language is very broad and comprehensive, and if it be given its natural and ordinary meaning, places an appeal in a criminal case upon the same footing as an appeal in a civil case, and therefore obliterates the distinctions which formerly existed between them. The Act of 1892, by declaring that no appeal shall stay the *execution*, not the *imposition*, of a sentence unless the affidavit provided for shall be made, necessarily implies that the appeal shall not be taken until after sentence has

been pronounced. And when it enacted that appeals from judgments in criminal cases may be taken in the same manner as in civil cases, it obviously did not mean to continue in force the method of procedure previously followed—which method was, as already observed, essentially different from that pursued in civil cases. It must follow from this that the Legislature intended that the whole record, including the demurrers and the exceptions, should be brought up at one and the same time by an appeal from the judgment in a criminal case, just as was done in a civil case when the Act was passed. If this be not the design of the Act it is difficult to assign or suggest a satisfactory reason for its adoption. It is objected, however, that such a construction of the statute will operate as a repeal of Rule 1, relating to appeals (now *sec.* 4 *of Art.* 5 *of the Code,*) and will, by dispensing with the formal assignment of errors by petition under that rule, occasion in this Court much uncertainty as to the grounds of demurrer relied on and considered in the Court below. But Rule 1 is not repealed. It remains in force and is applicable whenever the record is removed to this Court by petition as upon writ of error. In other words, when a petition as upon writ of error is appropriately resorted to, that is, where no exceptions are reserved, the provisions of Rule 1 must be observed; but where an appeal is taken under the Act of 1892, the whole record is brought up just as in a civil case. It is obvious that no greater uncertainty as to the grounds of demurrer will be occasioned by this method than is constantly encountered when demurrers are brought up by an appeal in a civil case. But, be this uncertainty what it may, it will result, if it should arise at all, from the plain language of the statute, and furnishes no reason for denying full effect to the enactment.

We hold, then, that when an appeal is taken in a criminal case under the *Act of* 1892, *ch.* 506, both the

exceptions and the judgment upon the demurrers are open for review in this Court. Of course this is a wide departure from the former practice, but the General Assembly has seen fit to ordain it; and without pausing to consider whether the change is a wise, a judicious, or a salutary one, we must conform to the requirement of the Legislature, and give to the statute the effect it was designed to have.

The demurrers to the indictment being, then, properly before us on this appeal, the first inquiry involved is as to the legal sufficiency of the indictment.

The first count of the indictment alleges that the Hon. HENRY W. HOFFMAN was on November 22d, 1892, one of the Associate Judges of the Fourth Judicial Circuit of the State of Maryland, and that it was his duty to sit in the trial of all criminal cases for the violation of the liquor and license laws of the State, occurring in Alleghany County, and "legally brought before him in said Court by indictment or otherwise, and to impose just sentences upon all offenders against said liquor and license laws who were convicted before him in said Court, and to that end that said Judge sat upon the bench in the Court house of said county, and pronounced judgments and sentences therefrom, and as such Judge occupied and used a public office in said Court house adjoining the Court room therein, and as such Judge * * * * * so performing the duties of the said office was then and there one of the servants of the public of said county in said Court house." That on the date above named the appellant was the owner, proprietor and publisher at Alleghany County of a certain newspaper called the *Cumberland Times*, and that maliciously and unlawfully contriving to injure, &c., the said Henry W. Hoffman as such Judge, did unlawfully and maliciously print and publish in said newspaper, called the *Times*, "a false, scandalous, malicious and defamatory

libel of and concerning the said Henry W. Hoffman as such Judge, and of and concerning his administration of the criminal laws of Alleghany County as such Judge, as the same related to the persons violating the license and liquor laws of said State * * * in the words following:'' ''Political 'Pulls' as a preventative of the purgation of the city, (meaning the City of Cumberland in the said Alleghany County.) The mighty and sudden zeal of the organ of the Court house ring (meaning thereby that there was a corrupt combination of persons in and about said Court house of Alleghany County aforesaid,) for the purgation of this city (meaning the City of Cumberland aforesaid) from the dens of infamy and vice which pollute it, (meaning thereby that there were places of infamy and vice in said city in which the laws of the State of Maryland were habitually violated,) is a matter of such surprise to so many that it cannot pass without comment. Cordially as the *Times* (meaning thereby the newspaper called the Cumberland *Times* aforesaid) welcomes each and every recruit in the cause of law and order, and indisposed as it is to scrutinize the motives of any who are willing to work with it in the cause, it cannot help applying to our own situation (meaning the situation of affairs in Alleghany County) the words of the New York *Herald* of Sunday (meaning a paper published in the State of New York) upon the same subject. Speaking of the crusade of the Rev. Dr. Parkhurst of that city against the dives there, the *Herald* says: 'You have noticed, perhaps, that no excise cases are prosecuted nowadays (meaning thereby cases in which the liquor and license laws of the State of New York were violated). There is the broken law, there is the man who broke it, but the law is a dead letter and the offender goes scot free. There is no reason why the public prosecutor should not handle these cases, but the fact is he does nothing of the kind,

and apparently doesn't propose to. Why not? Was he forced to agree as a condition of his election not to enforce the law? Did he make a bargain when results were hanging by a thread, and is it that which holds back his hand? There is at least ground for suspicion, since nothing has been done, or is being done, or is likely to be done. The trouble with New York and with every other large city on the continent is—too much politics. If a man wants office but refuses to make pledges which will compromise his future action, he can't have it. If, on the other hand, he is the obedient servant of those who hold the balance of power and will use his influence according to their bidding, he can roll up a safe majority.' It does not require either a diagram or a porus plaster to apply this (meaning the above quotation from the New York *Herald*) to our community (meaning said Alleghany County aforesaid) and make it stick. And earnest as the press seems to be on this subject, honest as the public indignation is, we will never have legislation at Annapolis in favor of restrictive liquor laws (meaning thereby that the members of the General Assembly of Maryland then assembled at the Capital of the State, would never pass restrictive liquor laws for the purpose of breaking up such dens of vice and infamy in said Alleghany County) and we will never have these laws enforced at home (meaning thereby that the people of said Alleghany County would never have the laws of Maryland, which had been passed to restrict said sales of liquor, and to prevent its illegal sales to minors and on Sundays, on election days and otherwise, enforced in said Alleghany County) until the public's servants in the Legislature and the Court house (meaning thereby the members of the General Assembly of Maryland aforesaid and the said Henry W. Hoffman as one of said Judges of said Court, in said Court house, in said Alleghany County) cease their alleged covenant-

ing with Hell and bargaining with the Devil in the form of the dive-keepers (meaning thereby that certain persons in said county illegally kept low and disorderly places whereat liquors were sold by said keepers in violation of the license and liquor laws of the State, and that the said Henry W. Hoffman as such Judge and as one of the public's servants in said Court house in said county, had bargained with said dive-keepers) for the sake of their (meaning said dive-keepers,) well-known, oft-proven and never-denied political power (meaning thereby that the said Henry W. Hoffman as such Judge and as one of the public's servants in said Court house, had for the sake of securing political support of said dive-keepers, and in corrupt violation of his duty aforesaid, unlawfully and corruptly bargained and agreed with them to afford them immunity from punishment from him as such Judge in said Court in consideration of his receiving from them their political support)."

The second count sets forth the same article and charges it to be a libel upon David W. Sloan, the State's Attorney of Alleghany County.

The third count likewise sets forth the same article from the *Times*, and charges it to be a libel upon Theodore Luman, Clerk of the Circuit Court for Alleghany County.

The fourth count also sets forth the same article and charges it to be a libel upon Samuel S. Warnick, the sheriff of Alleghany County. And the fifth count again sets forth the same article and charges it to be a libel upon the Judge, the State's Attorney, the clerk, and the sheriff of Alleghany County. The *colloquia* and the innuendoes in the second, third, fourth, and fifth counts are, *mutatis mutandis*, the same as those just quoted from the first count.

In civil cases the question as to whether the declaration contains a good cause of action is always matter of

law, and it is for the Court to determine on demurrer whether what is charged in the count amounts in law to slander. *Dorsey vs. Whipps*, 8 *Gill*, 462; *Haines vs. Campbell*, 74 *Md.*, 158. In criminal prosecutions for libel it is equally the province of the Court to decide upon demurrer whether the indictment contains a legally sufficient charge; and in determining that question the words used in the publication and set out in the indictmen must be given their natural and ordinary meaning, or their meaning as pointed and rendered significant by the previous averment of extraneous facts and the *colloquia* referring to them. Or, as put by Lord TENTERDEN, C. J., in *Harvey vs. French*, 1 *Cromp. & Meeson*, 11: "It is quite clear from all the modern authorities that a Court must read words in the sense in which ordinary persons, or in which we ourselves out of Court, reading the paragraph, would understand them." They cannot be enlarged or extended by an innuendo no matter how strongly an innuendo may impute an offensive meaning to them. *Commonwealth vs. Snelling*, 15 *Pick.*, 321. Whether an innuendo is good in law, that is to say, whether it is fairly warranted by the language set forth in connection with the inducement and *colloquium* is obviously matter of law. *Solomon vs. Lawson*, 8 *Q. B.*, 828. As the innuendo cannot enlarge, extend or add to the sense or effect of the words set forth, or properly impute an offence which the publication either in itself or in connection with the inducement and *colloquium* does not charge or fairly imply, it follows that the innuendo, which is simply equivalent to *scilicet* or *id est*, and whose whole office is to explain the effect of the words used, cannot, by enlarging the meaning of the words, make an indictment good which, without that innuendo, would be bad. If therefore, the words set forth in the first count of the indictment, either in themselves or in connection with the inducement and the

*colloquium* do not involve a charge against Judge Hoffman the innuendoes cannot make them do so; *Solomon vs. Lawson, supra,* and if the innuendoes attempt to do this by assigning as the correct and natural meaning of the words a construction not fairly inferrible from them, or not fairly deducible from the words as explained by the *colloquia* and the extraneous facts averred, the demurrer to that count should have been sustained.

Now, taken by itself and without reference to the inducement or the *colloquium,* the article alleged to be libelous does not assail Judge Hoffman at all. The plain, the obvious, and the natural import of its language, as quoted in the indictment, is applicable alone to the State's attorney. There is no reference by name, by description, by suggestion, or in any other way, to any official but the State's attorney, save perhaps, the members of the General Assembly. The extract from the New York *Herald* which is made the basis of the article in the *Times,* has relation exclusively to the prosecuting attorney of New York City; and there is nothing in that extract or in the application of it to Alleghany County which could by any fair, reasonable, or natural interpretation include Judge Hoffman. On the contrary, the alleged libelous article on its face expressly negatives such a construction, for it declares that the *Times* "can not help applying to" the situation of affairs in Alleghany County "the words of the New York *Herald* of Sunday *upon the same subject;*" and the subject and the only subject with which the *Herald* was dealing was the failure of the public prosecutor to indict and bring to punishment violators of the excise laws. It is true the *Times* speaks of "the Court house ring," but it nowhere intimates that Judge Hoffman was a member of that ring, or that the "ring" itself so alleged to exist, was a corrupt combination of public officers in and about the Court house. It is also true that the article asserts that

"we will never have legislation at Annapolis in favor of restrictive liquor laws and we will never have those laws enforced at home until the public servants in the Legislature and the Court house cease their alleged covenanting with hell, &c.;" but it would require a most forced and unwarrantable construction to justify the charge that Judge Hoffman was aimed at by the expression "public servants * * * * in the Court house" when the whole context of so much of the article as is quoted in the indictment unmistakably shows that the scope of the criticism or comment was confined to the alleged dereliction of the State's attorney, without the faintest reference to the Judge or to any other officer of the Court. As, then, the words set forth do not of themselves express or imply an imputation against Judge Hoffman, the first count of the indictment is bad, unless the inducement and the *colloquium*, taken in connection with the words, show with sufficient legal certainty that the libelous article refers to him. The inducement alleges merely that he was one of the associate Judges of the fourth judicial circuit; that as such Judge he has held Court in Alleghany County and acted as Judge in the trial of civil and criminal cases brought before him in that circuit, and occupied and used a public office in the Court house, and as such Judge was one of the servants of the public of said county. The *colloquium* avers that the words were published of and concerning him as Judge, and of and concerning his administration of the criminal law as it related to the violations of the liquor laws. The fact that he was a Judge, the fact that as Judge, he occupied and used a public office in the Court house, and the allegation that as Judge he was one of the servants of the public, are relied on to bring Judge Hoffman within the meaning ascribed by the innuendoes to the libelous article. The truth of the matter alleged by way of inducement is for the jury to

determine; but assuming its truth the question as to whether it is legally sufficient to warrant the application of the libelous words to Judge Hoffman is a question of law to be decided by the Court when raised by demurrer.

Judge Hoffman is not one of many persons severally attacked in the same article, for he is not personally or descriptively mentioned or alluded to; but the indictment by alleging in the first count that he was a public servant in the Court house, undertakes to select him, and him alone, from a whole class of public servants as the person libeled, though if that class includes him it also includes the other Judges on the same bench, and every public servant in the Court house of Alleghany County. In the absence of the most remote suggestion in the published matter that *he* was aimed at rather than some other person equally answering the description of public servant, the words "public servants," even by the aid of the *colloquium* and the inducement, can not be treated as designating *him* with any approximation to legal certainty, and cannot warrant the innuendo that *he* covenanted and bargained with dive-keepers for their political influence. This is well illustrated by the case put by Lord C. J. DENMAN in *Solomon vs. Lawson, supra:* "Suppose" said his Lordship "the words to be 'a murder was committed in A's house last night'; no introduction can warrant the innuendo 'meaning that B. committed the said murder.' For the Court must see that the words do not and cannot mean it, and would arrest the judgment." The same doctrine was recognized and applied upon a demurrer to the evidence in *Newbold, &c. vs. The J. M. Bradstreet & Son,* 57 *Md.,* 38. In *Van Vechten vs. Hopkins,* 5 *Johns.,* 211, it was stated that there were cases in which the words in themselves were held to be so vague and uncertain as that it could not be intended they were spoken of *any person;*

and it was conceded "that the Court and not the jury are to judge whether such uncertainty exists." It would seem to follow as a necessary consequence that where the words are specifically confined to a particular person, and are free from all ambiguity, no averment can be allowed which will extend the application of the libel to other individuals, or will force the words to embrace some one clearly not included. The decision of such a question by the Court on demurrer does not invade the province of the jury in a criminal prosecution for libel.

Fox's Libel Act passed in 1792, 32 *Geo. III, ch.* 60, provided that in all criminal proceedings for libel the jury shall be the judges of the question of libel or no libel, under the definition of the Court; and the leading case of *Baylis vs. Lawrence,* 11 *Ad. & El.,* 920, established the same rule in civil cases. Notwithstanding this, in subsequent civil cases, the English Courts have not hesitated to decide that publications were not capable of the defamatory meanings ascribed to them by the innuendoes. Thus in *Mulligan vs. Cole, L. R.,* 10 *Q. B.,* 549, MELLOR, J., speaking of the publication said, "I cannot help thinking that to an ordinary person it would convey no more than the legitimate information, and that no such defamatory meaning as that imputed by the innuendo, nor any other defamatory meaning, was intended to be expressed." In *Capital and Counties Bank vs. Henty,* 5 *C. P. D.,* 514, the question of libel or no libel was left to the jury, and they failed to agree on a verdict. A motion was then made to enter judgment for the defendants, but this was overruled on the ground that the publication was susceptible of the meaning alleged. On appeal to the House of Lords (*L. R.,* 7 *App. C.,* 741,) it was held "that in their natural meaning the words were not libelous; that the inference suggested by the innuendo was not the inference which reasonable persons would draw," and that consequently a judgment ought

to have been entered for the defendant.   See also *Shattuck vs. Allen, and others*, 4 *Gray (Mass.,)* 546.

We are not to be understood as calling in question the settled doctrine that when the libelous words are ambiguous or ironical, or otherwise, upon their face, do not distinctly indicate or designate or describe the person intended to be affected by them, they may, by appropriate prefatory averments and *colloquia*, be made sufficiently certain in their application; and that, certainty in such cases is to be arrived at by taking into consideration the facts stated in the inducement and the *colloquium* in connection with the whole of the libel —all of which must be submitted to the jury.

From the views we have expressed it follows, first, that the article is not on its face a libel on Judge Hoffman; and secondly, that it can not, by any inducement, *colloquium* or innuendo, be made to include him; because it is applicable only to the State's attorney.   As a consequence the first count of the indictment is bad, and the demurrer to it should have been sustained.

The third and fourth counts are, for the same reasons, also bad, and the demurrer should have been sustained as to them.

The fifth count couples the Judge, the State's attorney, the clerk and the sheriff together, and charges that the libel was levelled at them all.   Because the State's attorney is included it is insisted that this count is good. But as we have just held that the article is not a libel on the Judge, the clerk or the sheriff, the attempt, by joining their names with that of the State's attorney, to make language apply to them collectively which does not include them distributively, cannot prevail.   They can not be brought within the words or the meaning of the libelous article, merely by having their names associated in the indictment with the name of a person apparently intended to be assailed.   This count was, therefore, also

bad, and there was error in overruling the demurrer to it.

The demurrer was properly overruled as to the second count, that being the only good count in the indictment.

It has been strenuously insisted on the part of the State that as this one count is good the judgment cannot be reversed for the erroneous rulings on the demurrers to the other counts; and in support of this position the case of *Manly vs. The State,* 7 *Md.,* 149, has been relied on. But that case presented a very different question. No demurrer was filed there to the indictment, and neither of the counts was defective. The first count charged an assault with intent to murder, and the second count an assault and battery. The verdict was a general one of guilty. A motion in arrest of judgment was made because the verdict was alleged to be uncertain, and the uncertainty was supposed to arise from the fact that different punishments were applicable to the different counts. But it is perfectly obvious that a general verdict of guilty was in effect a finding upon both the counts and the practice under like conditions, both in England and in this country, was to pass judgment and sentence upon the count charging the higher grade of offence. But that is not the question now involved. Since the *Act of* 1852, *ch.* 63, (*Code, Art.* 27, *sec.* 286,) no motion in arrest of judgment can prevail if the defect relied on could have been taken advantage of on demurrer; and a demurrer is the proper mode to assail a bad count in an indictment.

If the demurrer had been filed generally to the whole indictment, and not to each count, and there was one good count, the overruling of the demurrer would have been proper, because, unless the whole indictment were bad, the demurrer could not be sustained. *Wheeler vs. The State,* 42 *Md.,* 563. But as the demurrers in the case at bar were to *each count,* and as the verdict was

general, and no means exist of determining upon which count it was rendered, or whether rendered upon all, it necessarily follows that if the verdict cannot be sustained upon each count it must be set aside.   If all the counts but one were bad, and each was demurred to, the traverser was, as a matter of strict legal right, entitled by the judgment of the Court to have the vicious counts eliminated before being compelled to plead not guilty. Forcing him, despite his demurrer, into a trial upon counts which were bad, and each one of which he had assailed, was a prejudicial error, that no general verdict could cure, notwithstanding there was one good count in the indictment.   It may well be that under an indictment containing several counts, all of which, except one, are bad, and each one of which has been demurred to, a general verdict of guilty might be rendered upon evidence adduced in support of the defective counts, whilst no evidence was offered under the good count; and thus a conviction would be secured upon the very counts which the Court below improperly sustained as good.   It is the absolute legal right of the accused not to be tried upon defective counts, the sufficiency of which he has separately challenged by demurrers; and it is no answer, after his demurrers have been wrongly overruled and a general verdict of guilty on all the counts has been rendered, to say that he has not been injured by the erroneous judgment entered against him, because there is one good count in the indictment.   *York vs. Johnson*, 116 *Mass.*, 485; *Ingram vs. State*, 39 *Ala.*, 250; *State, ex rel. Neff vs. Faurote, et al.*, 104 *Ind.*, 287; *Spire vs. Thelwell*, 2 *Crom., M. & Ros.*, 692; *Pinkney vs. Inhabitants de Rotel*, 2 *Saund.*, 379; *Parrett Navigation Co. vs. Stower, et al.*, 6 *M. & W.*, 564; *Briscoe vs. Hill*, 10 *M. & W.*, 735; *Hinde vs. Gray*, 1 *Man. & Gran.*, 195, note a; 1 *Chitty Pl.*, (16th Ed.) 696, and notes p. 697.   In *O'Connell, et al. vs. The Queen*, 11 *Clar. & Finn.*, 414–15,—a

case of great interest and importance—Lord CAMPBELL, speaking of an indictment containing two counts, one good and the other bad, said: "There may be one plea to the one count, and another plea to the other. There may be a demurrer to the bad count, and in that case there is no dispute that the opinion of a Court of error may be taken on its validity. * * * * * I may suppose another indictment, with two counts, and a separate demurrer to each count overruled; with a general judgment that the defendant, for his offences aforesaid, shall be fined and imprisoned. Is it to be said, that if he brings a writ of error, and shows one count to be bad, he shall have no relief unless he show the other count to be bad also? Let us see what authority there is for a doctrine which would lead to such strange consequences." Then after reviewing the cases cited to sustain the proposition that if there be one good count in an indictment, it is sufficient notwithstanding there are also bad counts, he concludes (p. 417) "There is therefore no text-book, nor decision, nor *dictum* to support a doctrine so entirely contrary to principle." And in the same case Lord DENMAN said "the judgment is not severable, and, if partially wrong, must, for that reason, be wholly reversed, on the very same unquestionable principle which must be applied to civil cases. The sentence in the one and the damages in the other, stand on the same footing, the moment it is clear that the judgment is general and proceeds on all the counts."

Just here we are confronted by the case of *Gibson vs. State*, 54 *Md.*, 447, which was not referred to in the argument, but which decides flatly the reverse of what we hold now. In that case there were two counts in the indictment. The prisoner demurred to the whole indictment and the demurrer was overruled. He then demurred to the first count alone, and that demurrer was also overruled. He next pleaded not guilty, and a general

verdict of guilty was found against him, whereupon he moved in arrest of judgment. This motion was overruled, and he filed a petition assigning errors, and prayed to have the record sent up as upon writ of error. The errors assigned were the overruling of his demurrer to the whole indictment, the overruling of his demurrer to the first count of the indictment, and the refusal to arrest the judgment. This Court held the first count of the indictment bad, but because there was one good count in the indictment refused to reverse the judgment. In support of that conclusion 2 *Wh. Crim. L.*, sec. 3047, (*5th Ed.*,) was referred to. The author after stating that the practice, both in England and this country, has always been, where there has been a general verdict of guilty on an indictment containing several counts, some bad and some good, to pass judgment on the counts that are good, proceeds: "The rule is not varied by the circumstance that a demurrer of the defendant to the bad counts was overruled, after which the defendant pleaded not guilty to the whole indictment, *it not appearing from the record* that the defendant was prejudiced by the introduction of evidence under the bad count which was not competent under the good counts." The only case upon which Dr. Wharton relied to uphold this doctrine was *Robbins vs. The State*, 8 *Ohio St.*, 131. On examining that case it appears that upon what is called a writ of error the Supreme Court of Ohio had before it a *bill of exceptions* containing the evidence in the case, and the charge of the trial Judge to the jury, as well as the questions raised by the demurrer to some of the counts of the indictment; and it was with a case thus presented that the Supreme Court of Ohio was dealing. Dr. Wharton's quotation from 8 *Ohio State* is from the *syllabus*, and not from the body of the opinion. In the opinion the Court say, "It is contended that this rule" [that if there be one good count in the indictment the

judgment will not be reversed on account of one or more bad counts] "does not prevail where the accused has, before plea, demurred to the bad counts; in other words, that it is the right of the accused to purge the indictment of all bad counts by demurrer.    There would be great force in this argument if the counts demurred to laid the foundation for the introduction of evidence on the trial, which would not have been competent or pertinent to sustain the good counts."   The indictment was for murder, and the counts demurred to were held to be sufficient as counts charging manslaughter.   As the latter counts were properly joined with other counts charging murder, the overruling of the demurrer was not erroneous.   The counts demurred to were not themselves defective.   Not being defective the indictment did not consist of some good and some bad counts, and therefore the question as to the right of the accused to have his demurrer to imperfect counts considered on appeal, after a general verdict of guilty, which might be supported by the good counts, did not really arise.   Consequently the case of *Robbins vs. The State* is not an authority for the proposition in support of which it was quoted by Dr. Wharton, and relied on in *Gibson's Case.*   The decision in *Gibson's Appeal* relies upon no other adjudged case, and is clearly wrong upon principle.   It cannot be adhered to without ignoring the authorities to which we have already made reference, and must, because erroneous, be overruled.

*Sec.* 15 *of Art.* 5 *of the Code* does not aid the conclusion reached in *Gibson's Case*, and cannot be invoked in the case at bar.   That section provides that no judgment or verdict shall be reversed if there be one good count in the *declaration.*   This obviously relates only to civil cases, and has no application whatever to *indictments.*   That is the plain import of the language, and the *Act of* 1809, *ch.* 153, from which *sec.* 15 *of Art.* 5

of the Code was taken, precludes, in the most positive manner, any other interpretation. The third section of the Act of 1809 declares, that nothing contained in the Act "shall be construed to extend to any criminal process or prosecution at the suit of the State."

We come now to the first plea in abatement, and it presents a most important question.

By *sec.* 7, *of Art.* 51 of the Code, it is provided that: "It shall be the duty of the Judges of the Circuit Courts for each of the counties, * * * * in the presence of such practising members of the Bar of said Court as shall think proper to attend, notice of the time and place having been first given to said Bar through the criers of said Courts, to proceed to select from the lists last furnished by the Clerks of the County Commissioners, * * * * * and from the poll-books of the several election districts of said counties, that shall be returned and filed in the clerk's office of said Court after any general election that may be last held previously to such selection, a panel to consist of the names of two hundred persons, * * * * * to be fairly and impartially selected, of the age aforesaid, by the said Judge, with special reference to the intelligence, sobriety and integrity of such persons, and without the least reference to their political opinions. * * * *."

The plea alleges that the jurors drawn for the April Term, 1892, of the Circuit Court for Alleghany County were not drawn as required by the statute, and that the presentment and indictment against the traverser were not found by a legally constituted grand jury. Upon this plea an issue was joined and a trial thereof was had before the Court, and the finding and judgment thereon were against the traverser. By the first bill of exceptions it appears that Judge Hoffman, who was the only witness examined on this issue, testified that he had directed the crier to notify the members of the Bar that on March

19th, 1892, he would proceed to draw the jury for the April Term of Court; that upon the day named "he went to the clerk's office *with a list of two hundred names;* that said list had previously been made out by him *from names of persons that he knew,* and *from names that had been suggested to him by different persons* in the different districts of the county, but was chiefly composed of names of persons that had previously been in the box, but had not been drawn out; that some of the names had been suggested by different members of the Bar; * * * * * that he announced that he was about to draw the jury; that if there were any objections to any of the names he would be glad to hear them; that *he then read from the list previously prepared by him,* which he regarded as a mere memorandum, the two hundred names; * * * * * that the names of the two hundred *were selected* from the list *previously* made by him; that no reference was at that time made to the poll-books or to the list furnished by the clerk of the County Commissioners, except that a reference was made to the poll-books to ascertain the correct spelling of one of the names, and to ascertain whether another person on said list was twenty-five years of age; * * * * * * * and that all of the two hundred names placed in the box appeared upon the poll-books of the several election districts of Alleghany County as were filed in the clerk's office of said Court after the last general election held previously to said drawing, but some of said names did not appear upon the list of tax-payers filed by the clerk of the county commissioners." From the list of names thus made up the jury was drawn, and the question we have to decide is whether this method of selecting a jury is a substantial compliance with the provisions of the statute just quoted. COLERIDGE, J., observed according to Lord DENMAN, "that all questions touching the formation of juries must be examined by the Judges with

very critical eyes." *O'Connell's Case, supra.* This Court has said in *Green vs. State,* 59 *Md.,* 123, that "the general method prescribed for drawing juries is mandatory, and substantial compliance with the provisions thereof in respect to the *selection* and *drawing* of jurors is necessary to make the jury a legal one; and unless the *selections are made* by the Judge *in the manner pointed out by the statute,* exception at the proper time and in the proper way, may be successfully taken to a jury improperly chosen and drawn; otherwise the statutory provisions would be wholly nugatory." Now, the statute unequivocally prescribes that the two hundred names which are to be placed in the box, and from which the names of the forty-eight persons who are to form the grand and petit juries are to be drawn, shall, in the presence of such members of the Bar as think fit to attend, be *selected* by the *Judge* from the tax list and the poll-books. The person who shall make the selection is the *Judge* and no one else; the selection is to be made publicly in the presence of the members of the Bar if they attend after notice; and the poll-books and tax list are the two exclusive sources from which the Judge can procure the names to be placed in the jury box. The selection must be made by him with special reference to the intelligencce, sobriety and integrity of the persons chosen. After this has been done he must sign a certificate that the "list has been duly selected in conformity with and according to the spirit and intent of" the law. Prior to the *Act of* 1867, *ch.* 329, jurors were selected by the sheriffs of the counties, but that method was so open to abuse, and in some sections of the State was so notoriously perverted for political and partisan purposes, that the General Assembly by the Act of 1867, radically changed the whole system. The Judge was substituted for the sheriff to make the selections. The statute, if the occasion which prompted its passage be

considered, never contemplated that, in the discharge of this important and delicate duty, the Judge was to accept the selections made by others. It was the obvious design of the law to provide the most minute safeguards for the selection of intelligent, disinterested and upright jurors; but its salutary policy might be utterly frustrated if the Judge, instead of himself making the selections, should merely adopt the lists privately furnished to him by persons, who, without his knowledge, may be interested in securing the attendance of particular individuals to serve upon the jury. The names thus furnished him may be names upon the poll-books or the tax list, but they are not names selected *by him* therefrom. If he places in the jury box the names thus given him, he accepts the selections of some one else. A Judge may very properly, and from the nature of the case, must often inform himself by inquiry as to the intelligence, sobriety and integrity of the persons whose names he may select; but such inquiries are quite different from adopting selections actually made by some one else. The statute requires that on the day appointed the Judge shall "proceed to *select*" from the tax lists and the poll-books "a panel of two hundred names"—not that he shall on that day proceed to read over a panel of two hundred names previously selected in some other way, and from some other source and by some other persons. A list of two hundred names made up in the manner testified to by Judge Hoffman, and made up in anticipation of the time designated by him for their public selection, is not a list "duly selected in conformity with and according to the spirit and intent of" the law; and this mode of proceeding is far from being a *substantial* compliance with the statute, but is, on the contrary, a wide departure from its requirements. It is true that Judge Hoffman announced that he was about to *draw*—not to *select*—the jury, and that if there were

any objections to any of the names upon the *list* he had prepared he would be glad to hear them; but this statement only emphasized the fact that the list had been made up *before* the time when the Code prescribed it should be made up. Confessedly the names were not taken either from the tax list or the poll-books—for these were referred to but twice—once to verify the spelling of a name, and once to ascertain a person's age. That the names actually selected happened to be upon the poll-books or the tax list was an accident—they were not *taken* from either; and if they were not taken from either at the time, and in the manner designated by the law, the plain letter as well as the manifest spirit of the statute was clearly disregarded. If the practice pursued in this case were tolerated, it is not difficult to foretell its wide-spread and disastrous consequences. Designing or interested parties, or others at their instance, might with ease impose upon a Judge by privately suggesting the names of persons unfit to be jurors; but, what is still more to be dreaded, they might, by the same means, secure for their own sinister ends an absolute dominion and control over the jury. It would be a lasting reproach to the administration of justice if the Courts sanctioned any construction of this statute which would afford the slightest opportunity for the cunning, the crafty, and the unscrupulous to secure the selection of a venal, a corrupt or a pliable jury. And yet such a result is precisely the one that will come to pass—perhaps not immediately, but none the less inevitably—unless the practice followed in this case is absolutely abandoned and discountenanced at once. If the selections of names be made *privately*, when the law declares that they shall be made *publicly;* if they be made *before* the day designated for them to be made, when the law requires them to be made *on* that day; and if they be made from sources *not* mentioned by the

statute instead of from the two specifically prescribed thereby; and a jury thus selected and drawn be held to be a legally constituted panel, then the most material provisions of the jury law will be swept away by sheer judicial legislation.

But this is not all: *Sec. 5 of Art. 88 of the Code of 1860* provided, that the sheriff should make oath that he would "not summon or return as a juror any person who * * * * * may have been recommended or requested to be returned by another person;" and *sec. 11 of Art. 51 of the Code of 1888* enacts, that "the name of no person disqualified or exempted by existing law from serving as a juror, or whom by existing law *the sheriff is forbidden to summon as such*, shall be selected and placed upon the panel or list from which the drawing is to be made as directed by this Article, &c." Obviously, then, persons whose names were recommended or suggested, the sheriff was, by the Code of 1860, forbidden to summon; and persons whom the sheriff was forbidden by that Code to summon, are by the eleventh section of *Art. 51 of the Code of 1888*, expressly and absolutely disqualified to serve as jurors. In other words, the disqualification of a person arising from the fact that his name has been recommended or suggested still prevails; and, as a consequence, it follows that such a person must be excluded from the jury. The re-enactment of this disqualifying provision signally demonstrates that the Legislature of 1867 were fully impressed with the conviction, as their predecessors had likewise been in passing the *Act of 1797, ch. 87*, that "the *integrity*, experience and intelligence of jurors are indispensably necessary for the due administration of justice."

From the forty-eight names drawn in the manner described the grand jury which presented and indicted the traverser were selected. His plea in abatement, raised in the proper way and at the proper time, the

question as to whether the jury were legally assembled, and the finding and judgment upon that issue should have been for him. *Clare vs. The State*, 30 *Md.*, 172. As the grand jury were not selected and drawn according to law the presentment and indictment found by them against the appellant were absolutely null.

This conclusion is decisive of the case, and we need not enter upon a consideration of the motion to strike out the judgment; but we proceed to examine the motion filed by the Attorney-General to dismiss the pending appeal.

On May 24th, 1892, the Court below entered judgment against the traverser, and on the following day the latter filed a motion to strike out the judgment. Whilst that motion was pending, and before it had been determined, the traverser, on July 15th, 1892, prayed an appeal from the judgment on the demurrers, and from the finding and judgment on the plea in abatement. It is now insisted by the Attorney-General that because after July 15th testimony was taken, and a hearing was had on that motion in the Court below, the appellant must be treated as having waived his appeal entered on July 15th—and this for the reason that the appeal of July 15th operated to remove the record from the Circuit Court, whilst the further proceedings on the motion to strike out the judgment could only have been taken upon the assumption that the record was still there, and that, if still there, the appeal had been abandoned. But we cannot assent to this. The motion to strike out the judgment was not a proceeding taken in lieu of the appeal, and its consideration by the Circuit Court in no way involved an interference with that appeal, unless the judgment had been actually stricken out. It does not follow that no proceeding can be had in the cause in the Court below, because an appeal has been taken. The appeal of itself neither stays execution nor necessarily suspends all

further proceedings in the Court below. Unless it does do this the mere ordering of an appeal did not deprive the lower Court of jurisdiction to hear the motion; and if the Court had jurisdiction to decide the motion after the appeal had been prayed, the hearing of the motion could not be regarded as a constructive or an actual waiver of the appeal. That the entry of an appeal does not absolutely prohibit the parties from thereafter taking other steps in the Court below is perfectly clear. The recent case of *Rohrback vs. Rohrback,* 75 *Md.,* 317, furnishes an illustration of this. There a bill for a divorce had been filed by a husband against his wife. The Circuit Court decreed against him and dismissed the bill. He appealed to this Court, and after his appeal had been taken, the wife filed in the same case in the lower Court a petition asking that she be allowed counsel fees for the defence of her case in the Court of Appeals. The Circuit Court dismissed her petition on the single and distinctly stated ground, that as the husband had prayed an appeal, the record was no longer in the lower Court, and that Court was without jurisdiction to entertain her petition filed in the same case. Upon appeal the order dismissing that petition was reversed, though the decree of the lower Court dismissing the husband's bill was affirmed, this Court holding that the Circuit Court had jurisdiction in the premises notwithstanding the appeal taken by the husband. See also *Rice vs. West,* 42 *Md.,* 614; *Thompson vs. McKim,* 6 *H. & J.,* 333. But if it be granted that after the entry of an appeal the lower Court had no longer jurisdiction to hear the motion, then, instead of the appeal being waived or abandoned by the hearing of the motion, the motion was prematurely and improvidently heard. In either view the motion to dismiss must be overruled.

Inasmuch as we have not found it necessary to consider the appeal from the refusal of the Court to strike

out the judgment, the motion to dismiss that appeal need not be passed on.

Because of the errors we have indicated the judgment must be reversed; and as the traverser cannot again be tried upon an indictment returned by a grand jury improperly assembled, a new trial will not be awarded.

<em>Judgment reversed<br>without awarding a new trial.</em>

(Decided 13th January, 1893.)

Robinson, J., filed the following dissenting opinion:

I cannot agree with the majority of the Court as to the construction of the jury Act. I cannot agree, because the construction now placed upon it, is not only against the *uniform practice,* that has existed in this State ever since it was passed, a period of five and twenty years, but against, it seems to me, the letter and the spirit of the Act itself. One might infer from the argument of counsel that the Act was passed solely for the benefit of Alleghany County, and that its construction was to be governed by conditions existing or supposed at least to exist in that county. It is an Act however, providing the mode and manner for the selection of jurors for each and every county in the State, and like all other statutes it is to be construed according to its plain import and meaning, bearing in mind the object and purposes for which it was passed.

Now what are the provisions of the Act? It provides that it shall be the duty of the Judges of the Circuit Courts for each of the counties, in the presence of such members of the Bar, as shall think proper to attend, to select from the tax list and poll-books of the several election districts of the county, a panel of two hundred persons, the said panel to be fairly and impartially selected, with special reference to the intelligence, sobriety and

integrity of such persons, and without the least reference to their political opinions.

It further provides, that the names thus selected shall be written on separate ballots and these ballots shall be put in a box, from which shall be drawn, one by one, forty-eight ballots, and the names appearing on the ballots so drawn, shall constitute the grand and petit juries.

Now I agree that the Judge himself and no one else is to select the panel of two hundred persons. I agree too, that this selection is to be made publicly, in the presence of such members of the Bar as may think proper to be present. But I cannot agree, that the *tax lists and poll-books* "*are the two exclusive sources from which the Judge can procure the names to be placed in the jury box.*" These two sources merely show who are *voters* and who are *tax-payers*. But these are not the only qualifications prescribed by the Act. On the contrary, it provides in express terms that the panel shall be selected "with *special* reference to the *intelligence, sobriety and integrity of the persons selected.*" And however wide may be his acquaintance, it can hardly be presumed that a Judge can from his own personal knowledge determine the qualifications of the five thousand persons in some counties and fifteen thousand in others, whose names appear upon the tax list and poll-books. In fact, the Court say, a Judge may very properly, and from the nature of the case, must often inform himself by inquiring as to the qualifications of the persons selected. But he cannot request persons, who may be familiar with the people living in their respective neighborhoods to furnish or suggest the names of persons qualified in their judgment to act as jurors. Not that the statute so forbids, for it is entirely silent as to the mode and manner by which the Judges are to inform themselves as to the qualifications of the persons to be selected.

But because it is said, that the names thus suggested are not names selected by the Judges themselves. Now, if by this it is meant, that they are not names selected by the Judges from their own personal knowledge we agree, but at the same time they are none the less the selection of the Judges though made upon the suggestion or information of others. A Judge is in no manner bound to accept the names suggested; he may upon consideration accept all, or some, or reject the list altogether. Then again it is said it might afford an opportunity "for the cunning, the crafty and the unscrupulous, to secure the selection of a venal, a corrupt or pliable jury." These are evils certainly to be avoided. But this objection assumes and must necessarily assume, that a Judge would request or accept the suggestions of the "cunning" and the "crafty." This it seems to me is rather a violent presumption. On the contrary, is it not fair to presume, that a Judge would take to his counsels, persons of character, well known to him, and upon whom he could confidently rely for impartial and independent advice? But, be this as it may, these objections, imaginary at the best, it seems to me, apply with equal force in all cases where a Judge finds it necessary to inform himself as to the qualifications of the persons to be selected by information derived from others. Suppose for instance, and we must deal with this matter practically, he takes a list of names, and upon inquiry he is informed that A. B. C. are qualified jurors, but that D. E. F. are not, and upon this information the former are selected; is the selection thus made by the Judge any more his own selection, than if the names had been in fact suggested to him? Would not "the cunning" and "the crafty," have the same opportunity to mislead him, and to secure a corrupt jury in the one case as in the other? And to hold that a Judge may inform himself by inquiry, but that he cannot request others upon

whom he can rely to furnish or suggest to him the names of persons in different parts of the county possessing the qualifications prescribed by the Act, is a *distinction* it seems to me with all deference, *without* a *difference*. There is nothing either in the language of the Act, or the purposes for which it was passed, to support such a distinction. Having imposed upon the Judges the duty of selecting jurors, the Legislature meant that they should avail themselves of all such sources of information as they, in their judgment, might deem proper. It was never meant to embarrass them by such refined distinctions as to render the selection of jurors by them almost impracticable. I say impracticable, for such are the changes constantly going on in a population, by deaths, removals, and other causes, that a Judge would find it a difficult matter even in his own county, from his own personal knowledge, to select from the tax list and poll-books two hundred persons having the qualifications required by law. He might be able to select that number from among his own acquaintances, but the selection of jurors is not to be confined to such persons only as may be known to him, but from the body of the people, and from all parts of the county. And, besides, how is he to make the selection in another county, which has no resident Judge? The tax list and the poll-books are, say the Court, the *"exclusive sources from which he can procure the names,"* and though he may not know fifty persons whose names appear thereon, yet he must not request any one else to furnish or suggest the names of persons suitable as jurors. How, then, is he to procure the names? He must necessarily select the two hundred names from among the five or ten thousand to be found on the poll-books and tax list somewhat at random, and then he must inform himself, by inquiry of others, as to the qualifications of the persons thus selected. It may be that not one-fourth or

fifth of the persons so selected possess the qualifications required by the Act, and then he is obliged to select again at random from the poll-books and tax list other names in the place of those rejected, and so on, till at last he has found two hundred persons of "intelligence," "sobriety," and "integrity."

Or, instead of this mode, he may take the poll-books and tax list, and in the presence of the members of the Bar and other persons, go over the names one by one, till, from his own knowledge or from information derived from others, he has found two hundred qualified jurors. This, one of the Judges in my circuit attempted to do, and it ended in a general wrangle between certain members of the Bar as to the respective qualifications of the persons to be selected. I cannot suppose for a moment that the Legislature ever meant to surround the selections of jurors with such embarrassments and difficulties as these. No such construction was ever put upon this Act during the five and twenty years since it was passed, and tested by it, I question whether during all this period there ever has been in this State a lawfully constituted grand or petit jury. I am quite sure that I have not, nor has any other Judge so far as I am advised, ever selected a panel in conformity with the construction of the Court. On the contrary, I myself, and other Judges, to my knowledge, have selected jurors in the same manner substantially as the panel in this case was selected by Judge Hoffman. I have always considered it to be my duty only to inform myself, by inquiry of persons in whose judgment I could only rely, *or by any other means*, as to the qualifications of persons residing in different parts of the county. And when necessary I have not hesitated to request them to furnish me the names of such persons for my consideration. There may be some objections in requiring the Judges to perform this or any other duty not strictly judicial; and they

Avirett *vs.* State.

would, I know, be very glad, so far as concerns themselves, to be relieved of it. At the same time it is the best mode, it seems to me, for the selection of competent and impartial jurors; and it is to be hoped that the law will be so amended as to relieve the execution of it from the difficulties resulting from the construction now placed upon it. If not, then the sooner it is repealed, and some other mode adopted, the better it will be for the administration of the law.

As to the other questions decided by the Court,—whether the libel was properly pleaded in the several counts of the indictment, or whether one good count in an indictment will sustain a verdict of guilty where there has been a special demurrer to each count,—I express no opinion. I express no opinion because, if the grand jury was an illegally constituted body, and the Court has decided it was, and the indictment was a nullity, then there is an end of the case. This being so, whether *Gibson vs. State*, 54 *Md.*, 447, was rightly decided, is not really a question before the Court—it is not before the Court because, the indictment being a nullity, a conviction under it, could not be sustained, irrespective altogether whether the counts are good or bad. This much, however, I may say, that the decision in that case was rendered after full consideration, and concurred in by BARTOL, C. J., BOWIE, MILLER, ALVEY, and ROBINSON, J., and I hardly think it necessary to reverse it upon what seems to me to be merely a moot question. *"Stare decisis"* is an old, but safe, maxim of the law.

(Filed 2nd February, 1893.)