CHARLES DeWITT *vs.* WM. W. SCARLETT ET AL.

*Libel—Publication of Merchant's Name With Rating Under-*
*stood to Show Lack of Credit—Words Used*
*in Special Sense—Demurrer.*

When the words alleged to be a libel upon the plaintiff are not actionable *per se,* but are made actionable because a special damage was suffered by the plaintiff from the publication, that special damage must be explicitly stated in the declaration and proved at the trial.

To publish of a merchant anything that imputes insolvency, or the want of integrity, or incapacity, is libelous *per se,* if without justification, and general damages may be recovered.

Words are to be taken in their natural and ordinary meaning, unless it be alleged and proved that they were used by the defendant and understood by others in a different sense.

A declaration alleged that the defendants, maliciously intending to injure plaintiff in his business because he had ceased to subscribe to a book or list of commercial rating issued by the defendants, caused the plaintiff's name to be printed in an edition of the book without any letter or figure standing alongside of it, the same being what is designated as a blank rating; that such blank rating, according to the key published in the book, was purported to be published as meaning a person whose business and investments render it difficult to rate satisfactorily, but that the common acceptation in the trade and among the subscribers to the book was that the

person so rated blank is worthless as to his financial condi-
tion, untrustworthy as to his character and unworthy of
credit in commercial transactions, and that the publication
of the said libel utterly destroyed the credit which the plain-
tiff had theretofore enjoyed and caused many persons from
whom plaintiff had bought goods to demand immediate pay-
ment and to refuse to sell plaintiff goods on credit as there-
tofore, so that the plaintiff was seriously injured, etc. *Held,*
on demurrer, that this declaration sets forth a good cause of
action, since if the publication of the plaintiff's name with
the·blank rating was understood by the public in the sense
alleged, and the defendants knew that it would be so under-
stood, such publication, if not justified, was libelous *per se.*

*Decided March 31st, 1910.*

Appeal from the Superior Court of Baltimore City.

The cause was argued before BOYD, C. J., BRISCOE,
PEARCE, SCHMUCKER, BURKE, THOMAS, PATTISON and
URNER, JJ.

*Joseph N. Ulman* (with whom were *Lewis W. Lake* and
*Harman, Knapp & Tucker* on the brief), for the appellant.

*William Reynolds,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

This appeal is from a final judgment in favor of the de-
fendant on a demurrer to a declaration in an action for libel.
The question presented is a narrow one, but one of some inter-
est and importance, and in order that it may clearly appear,
it will be necessary to set out the declaration somewhat in
detail.

It charges that, "the plaintiff is engaged in business in the
City of Baltimore, in the State of Maryland, as a maker and
dealer in machines and hand cut corks, and imported and
domestic bottles, demi-johns, glass, bottle caps, etc. * * * and

has been engaged in said business in said city upon his own account ever since the year 1886. That the defendants are the district manager and assistant manger respectively of a firm known as R. G. Dun & Company, which firm conducts a mercantile agency with branches throughout the United States, and publishes and circulates among its several thousand subscribers a certain book or list of commercial ratings in which are printed the names and occupations of persons, firms and corporations engaged in commerce in the several states and cities of the United States, said names being arranged in geographical and alphabetical classification, which makes the said book a means of ready references; that alongside the names published in the said book or list of commercial ratings there appear certain letters and numerals, which according to the key published at the beginning and at the end of said book furnish a designation of the financial worth and reliability as to credit and character of the persons beside whose names the said letters and figures appear; and the said firm of R. G. Dun & Company in the conduct of its business places copies of its said book or list of commercial ratings with all of its subscribers throughout the world." That after the plaintiff "went into business on his own account in the year 1886 as aforesaid, he was for many years a subscriber to the said book or list of commercial ratings, and paid the said R. G. Dun & Company, through its agents, the defendants, an annual sum of from seventy-five to one hundred dollars therefor, and that during the time when the plaintiff was such a subscriber he was rated in said book or list of commercial ratings as having a financial worth of from ten to twenty thousand dollars, and as enjoying high credit; but that after the plaintiff ceased to subscribe for the said book or list, and to pay the said annual sum of from seventy-five to one hundred dollars, although the plaintiff's financial worth and reputation for business honesty remained as great as it had been prior thereto, and in fact increased by reason of the plaintiff's strict attention to business, nevertheless, the defendants maliciously and without just cause there-

for procured the said firm of R. G. Dun & Company in their edition of the said book or list of commercial ratings published in the month of January, 1909, to print the plaintiff's name without any letter or figure of any kind whatever standing alongside of it, the same being what is designated in trade circles as a 'blank rating'; that such 'blank rating' according to the aforesaid key published at the beginning and at the end of said book is purported to be explained by the following words contained in the said key printed as aforesaid, to wit: 'The absence of a rating whether of capital or credit indicates those whose business and investments render it difficult to rate satisfactorily. We, therefore, prefer in justice to these to give the detail reports on record at our offices.' But that the common acceptation in the trade and among many thousand of subscribers to the said book or list of commercial ratings throughout the United States of such a blank rating even though the same is purported to be explained and modified by the said explanatory statement published in said key is that the person so rated blank is worthless as to his financial condition, untrustworthy as to his character and utterly unworthy of credit in any commercial transaction. * * * That the defendants falsely and maliciously and in order to punish the plaintiff for having refused to continue to subscribe for the said book or list of commercial ratings, and for having refused to pay an annual tribute of from seventy-five to one hundred dollars as aforesaid, and with the malicious intent to injure the plaintiff in his trade or calling, and to break up and destroy the plaintiff's business and deprive him of the means of a livelihood did, although knowing full well that the common acceptation in the trade and among the thousands of subscribers to the said book or list of commercial ratings throughout the United States of such a blank rating purported to be explained and modified by the said explanatory statement published in said key is that the person so rated blank is worthless as to his financial condition, untrustworthy as to his character, and utterly unworthy of credit in any commercial

transaction, cause the publication of the plaintiff's name in said book or list of commercial ratings with a blank rating as aforesaid, meaning and intending to publish the plaintiff as a person who is worthless as to his financial condition, untrustworthy as to his character, and utterly unworthy of credit in any commercial transaction * * * That the publication of the said libel has utterly destroyed the credit which the plaintif has heretofore enjoyed, and has caused many other persons, firms and corporations from whom the plaintiff has been purchasing goods to demand immediate payment of the balance due them, and to refuse to sell the plaintiff goods upon the usual terms of credit heretofore allowed, so that the plaintiff who but for the publication of said libel would be in a better condition financially than he has ever been, is seriously injured in his business, and has suffered and will suffer a heavy loss and damage in the prosecution thereof; and that said business has been worth more than ten thousand dollars per annum to the plaintiff for a long period."

The rule is that where the alleged libel is not actionable *per se* but is made actionable by reason of some special damage suffered by the plaintiff in consequence of the publication, the special damage must be explicitly stated in the declaration and strictly proved at the trial.

It is said in *Odgers on Libel and Slander,* Star Pages 302-303, (Text Book Stries), that: "To allege generally that in consequence of the defendant's words the plaintiff has lost a large sum of money or that his practice or business has declined, is not a sufficiently precise allegation of special damage  The names of the persons who have ceased to employ the plaintiff, or who would have commenced to deal with him had not the defendant dissuaded them, must be set out in the statement of claim * * * and they must themselves be called as witnesses at the trial to state their reason for not dealing with the plaintiff.  Else it will not be clear that their withholding their custom was in consequence of defendant's words; it might well be due to some other cause. * * * If the plaintiff cannot give the names of those who have ceased to deal with

him, or cannot prove that their so ceasing is due to the defendant's words, he must be non-suited; although there has in fact been a falling off in his business." This rule is distinctly recognized by Mr. Poe in his work on *Pleading,* secs. 174, 572, and was applied in *Dicken* v. *Shepherd,* 22 Md. 399, and in *Newbold* v. *Bradstreet,* 57 Md. 38. In the latter case the words published were held not to be actionable *per se.* The questions asked in the sixth, eighth and fourteenth bills of exception were: 1. "State whether the publication in Bradstreet's Daily Sheet of Changes, which has been offered in evidence, had any effect on your business?" 2. "State whether the publication of the words mentioned had any effect on your mercantile credit?" 3. "State what would be the effect on a merchant's credit, to give a mortgage on his chattels?" JUDGE ALVEY, in disposing of these exceptions, said: "All proof therefore, of general damage, such as that stated in the sixth, eighth and fourteenth bills of exception, was properly excluded. It could only have been offered in case the libel were actionable *per se;* but not when it is only actionable with respect to such special damage as may be alleged." And in passing on another exception in the case he said: "The special damage must be proved as laid, and if the special damage is alleged to consist in the refusal of a third person to deal with the plaintiff, or to give him credit, or in the action of any third person in enforcing obligations; evidence is not admissible of the declarations of such third person as to his reason or motive for so acting, the third person himself must be called to prove the motive."

The damages alleged in this case are that the publication "has entirely destroyed the credit which the plaintiff has heretofore enjoyed, and has caused many of the persons, firms and corporations from whom the plaintiff has been purchasing goods to demand immediate payment of the balance due them, and to refuse to sell the plaintiff goods upon the usual terms of credit heretofore allowed, so that the plaintiff * * * is seriously injured in his business, and has suffered and will suffer heavy loss and damage in the prosecution thereof," and

it is apparent that they are only such damages as may be re-
covered where the matter published is libelous *per se,* and
that the declaration does not contain such an explicit state-
ment of *special damage* as is necessary to support an action
where the alleged libel is not actionable *per se.*

The important question, then, is, are the words set out in
the declaration libelous *per se.* "To say or publish of a mer-
chant any thing that imputes insolvency, inability to pay his
debts, the want of integrity in his business, or personal in-
capacity or pecuniary inability to conduct it with success, is
slander or libelous *per se,* if without justification, and general
damages may be recovered. Such publication *necessarily,* in
legal contemplation, tends to injure the credit and standing
of the party of whom it is made." *Newbold* v. *Bradstreet,*
*supra.*

We are not required in this case to determine whether it
would be libelous *per se,* to publish of a merchant, whose in-
tegrity and ability to meet his obligations is entirely satisfac-
tory and should not be questioned, for the purpose of injur-
ing his credit and business, in a list of ratings or book in-
tended for circulation among those seeking information as to
the financial standing and business integrity of persons with
whom they may desire to deal, a blank rating, with the ex-
planation that: "The absence of a rating whether of capital
or credit indicates those whose business and investments ren-
der it difficult to rate satisfactorily. We, therefore, prefer in
justice to these to give the detailed reports on record, in our
offices." It might be questioned whether these words, giving
them their *ordinary* meaning, even when interpreted in the
light of other ratings and explanations contained in the list
or book, impute to one of whom they are published the want
of business integrity or financial ability. But words may
have another and different meaning, according to the connec-
tion to which they are employed and the sense in which they
are used and will naturally be understood by those to whom
they are published. They may have a local significance, or
may, by usage, have acquired a peculiar meaning, and they

should be given the meaning they are intended to and will naturally convey to those to whom they are addressed. Mr. Odgers says (*Odgers on Libel and Slander,* Star Page 97) : "The rule that has now prevailed is that words are to be taken in that sense that is most natural and obvious, and in which those to whom they are spoken will be sure to understand them." It is said in *Newbold's Case, supra:* "The general rule doubtless is, that the ordinary popular meaning or sense of the language alleged to be libelous is to be taken to be the meaning of the publisher; but a foundation may be laid for showing another and different meaning, * * * something may have passed or some habit or usage may have obtained, that gave a peculiar meaning or significance to the expressions employed." In the case of *Brinsfield* v. *Howeth,* 107 Md. 285, JUDGE BURKE said : "If the defendant by the use of language attributed to him meant to impute the want of chastity to the plaintiff, an averment may be introduced that by a local, or *neighborhood* understanding such words mean or are understood to impute the meaning ascribed to them in the *innuendo.* Under such a declaration the plaintiff could prove 'any extraordinary or peculiar meaning expressed by the words in question.' " In the case of *Kingsbury* v. *Bradstreet,* 116 N. Y. 211; 22 *N. E. R.,* 365, the plaintiff alleged that the defendant published a circular containing the following statement referring to him: "Conandagua, Kingsbury, Sherman, Gro * * *," and "that the defendant thereby meant that its customers should understand that he 'in some way or manner had become financially embarrassed in his business, and that his credit and good name as a merchant had become affected or impaired, and especially * * * that he had failed in business, or had made a general assignment for the benefit of his creditors." The defendants replied denying that the words conveyed or were intended to convey such meaning, and stating that at the bottom of the circular was an explanation of what the characters in question meant, in these words: "For explanation, please call at our office." The Court, in sustaining a judgment for the defendant, said: "The circular in ques-

tion, on its face, is not a libel on the plaintiff * * * when construed according to their natural meaning they are innocent and harmless; and, as thus construed they are not shown to be false. The use of characters in the body of the page to direct the attention of the reader to the margin or bottom thereof is common in many publications, and of itself can excite neither suspicion nor surprise. The plaintiff proved that such was the sole intention of the defendants in making use of the double stars in the publications complained of. The only innuendo alleged by the plaintiff states simply what the defendants meant; not what its subscribers or public understood. There is no apparent ambiguity as to the meaning or the application of the words. Without proof of extrinsic facts the language of the publication, including the characters used is capable of an innocent construction only. Standing by themselves, they are incapable of a defamatory meaning. If there was a latent injurious meaning arising from facts, known both to the defendant and its subscribers, which would reasonably lead the latter to understand the words in a secondary and defamatory sense, it was neither alleged nor proved. Words not libelous *per se* may become so from the connection in which they are used, or the circumstances under which they are published. The situation and surroundings of the most innocent expression may make it libelous, but they must be distinctly alleged and proved."

In the case at bar, the declaration charges "that the common acceptation of the trade and among the many thousands of subscribers to said book or list of commercial ratings throughout the United States of such a blank rating," accompanied by the explanation in the key, "is that the person rated blank is worthless as to his financial condition, untrustworthy as to his character and entirely unworthy of credit in any commercial transaction," and that the defendants, knowing that such was the common acceptation of the blank rating, etc., and intending to injure the plaintiff, caused the same to be published of the plaintiff, "meaning and intend-

ing to publish the plaintiff as a person who is worthless in his financial condition, unworthy as to his character, etc."

Now if, as alleged, the blank rating and accompanying explanation set out in the declaration, have acquired the meaning and significance stated, among those to whom the lists or books are sent, and the defendants as alleged, knowing that they were so understood, caused the name of the plaintiff to be published in the lists or books with a blank rating, etc , for the purpose of injuring him, the words must be taken in the sense in *which they were used,* and in which those to whom they were published *must have understood them.* Judged in that sense, giving them that meaning, the publication, if without justification, was clearly libelous *per se.* It may or may not be difficult to prove that blank ratings and the explanation contained in the key, have acquired the meaning alleged, *but if they have,* then they amount to a publication that the person so rated, is, in the language of the declaration, "worthless as to his financial condition, untrustworthy as to his character and wholly unworthy of credit in any commercial transactions."

It can make no difference in principle what may be the words or character employed. If they have acquired, among those to whom they are published, a definite significance, and the publisher is aware of the construction that will be placed upon them, their actionable character must be determined accordingly. On the other hand, words cannot be given any other than their natural and ordinary meaning, unless it be *alleged* and *proved* that they were *used* and *understood* in a different sense. The one who publishes them, or causes them to be published, cannot complain if his words are judged by the sense in which they were used and in which he knew they would be understood, and it must be presumed that he intended them to mean what he knew those to whom they were published would understand them to mean.

We have examined the cases cited by counsel for the appellee but do not regard them as in conflict with the views we have expressed. The matters alleged in *colloquium* warrant

the meaning ascribed to the publication in the *innuendo,* and, for the reasons stated, we must reverse the judgment of the Court below and remand the case.

>                    *Judgment reversed with costs, and new trial awarded.*