AMERICAN STORES COMPANY *v.* BYRD

[No. 267, September Term, 1961.]

6

*Decided May 22, 1962.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, HORNEY and MARBURY, JJ.

*William W. Travers* and *Walter C. Anderson,* with whom were *Webb & Travers* and *Alexander G. Jones* on the brief, for appellant.

*John B. Robins* and *Thomas S. Simpkins,* with whom were *Robins & Robins* and *Simpkins & Simpkins* on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

This appeal is from a judgment for $25,000 entered by the Circuit Court for Somerset County in favor of Helen Cox Byrd (plaintiff or customer) against the American Stores Company (defendant) on the verdict of a jury in an action for slander.

On the afternoon of October 4, 1960, the customer entered the store of the defendant in Princess Anne accompanied by her twin daughters. Her son remained in the parked automobile. She purchased a gallon of milk and two cans of baked beans and paid for them. While she was waiting for her change and packaging of the purchases, the store manager (Ralph W. Pilchard) approached the check-out-counter, spoke to the customer (whom he had known for a number of years) and gave the cashier (Edna E. Payne) some money which, absent-mindedly, she put in the middle or stamp drawer of the cash register. After being checked out, the customer left the store and was proceeding toward the automobile when the store manager, having been informed by the cashier that the money he had given her could not be found, hurried out of the store and "hollered" to the customer. In a loud and angry tone of voice, and in the presence of her children and the town police officer (John D. Ford) and other persons on the street, the store manager demanded to know whether she had gotten or picked up the money that he had placed on the counter.

8

The original declaration alleged that the words, actions and conduct of the store manager, in asking the customer "did you get the $117 that was on the counter" and that "it was gone" and by demanding to examine the package containing the purchases and to look into her pocketbook and wallet, were slanderous *per se* and in fact charged that the customer had committed larceny. Subsequently, for the reason that the "innuendo explaining the words spoken was omitted by inadvertence," the plaintiff sought and was permitted to amend the declaration. In the amended declaration, the plaintiff alleged that the store manager "did intend to and mean to charge" that the customer had committed larceny and that the words, actions and conduct of the manager were slanderous *per se*. The plaintiff further alleged that the charge was false and malicious; that it had been overheard by numerous people; that theretofore she had enjoyed a good reputation for honesty and integrity; and that as a result of the charge she had been brought into public infamy and disgrace and had suffered humiliation and anxiety, and was otherwise damaged. But she did not allege any special damages that she had suffered as a result of the incident. No demand was made for a bill of particulars. Nor was there a demurrer to either the original or amended declarations. The defendant in its "answer," however, besides setting forth the usual general issue pleas, alleged that the colloquium, together with the averred slanderous words, did not constitute slander or was not slanderous *per se;* and that the allegation in the amended declaration to the effect that the words spoken by the store manager did intend to and mean to charge the plaintiff with a felony, was an erroneous conclusion of law and was not supported by the facts.

According to the story the plaintiff-customer related at the trial, this is what was said and done:

> (Manager) : "Just a minute? * * * Did you pick up that money that was on the counter?"
> (Customer): "No. Mrs. Payne put my change in my hand."
> (Manager) : "I'm not talking about that. * * * I'm talking about the money that I laid on the counter."
> (Customer): "No, I did not."

(Manager): "Are you sure?"

(Customer): "I'm sure I didn't pick up any money."

(Manager): "It's funny. * * * The money, you were there when I put the money down. * * * And when you walked out we can't find the money."

(Customer): "Well, * * * I'm sorry."

(Manager): "Well, we just can't find it."

(Customer): "Mrs. Payne put the money in the drawer."

(Manager): "She did not. We looked."

(Customer): "Well, I'm sorry. I don't know nothing else."

(Manager): "Where's your packages?"

(Customer): "The package is on the front seat. The milk is in the back seat."

The manager went to the left front window of the automobile and asked the son (Johnnie) for the package. Johnnie, who had just looked in the package did not give it to him, but he told him that there was nothing in the package but two cans of beans.

(Manager): "Come on, come on. Give me the package."

(Customer): "Give him the package, Johnnie."

Johnnie then gave the package to the store manager. He took it out the window, rested it on the ledge, looked in the package and then tore it open. When one of the cans of beans almost fell out, the manager, who seemed to the customer to be "very angry and upset," grabbed the can, straightened the package and threw it over on the back seat. He then turned around to face the customer again.

(Manager): "Well, it certainly is funny. * * * Would you mind opening your pocketbook?"

(Customer): "No, I wouldn't mind."

The customer opened her pocketbook and the store manager looked into it, and when he wanted to see what was in the

zippered compartment, she opened that too, but when he asked to look into her green wallet she refused.

> (Customer): "Mr. Pilchard, I didn't open my wallet in your store and I'm not opening my wallet now because what's in there belongs to me, not to you."
> (Manager): "I can't understand it."
> (Customer): "Mr. Pilchard, I told you Mrs. Payne put that money in the drawer."
> (Manager): "Will you go back in the store with me?"
> (Customer): "Sure."

The customer, who stated that she was upset, that her feelings were hurt, that she was ashamed, and that she was really "mad," appeared as if she might cry but she did not and managed to compose herself, while the manager, according to the customer, looked as if he could slap her face.

> (Manager): "Come on, let's go? Come on, let's go. * * * All right, let's go?"

On the inside of the store, the manager, who was still angry, and looked "hateful" and "mean," according to the customer, did not ask the cashier to take another look until the customer reminded the manager that the money was in the middle drawer. When the cashier was told to look again "to satisfy her" the money was found where the customer had said several times it had been placed. Whereupon the store manager apologized. And the customer left the store.

The testimony of the plaintiff as to what had occurred on the street was corroborated by the police officer, and although he admitted he did not hear the store manager accuse the customer of "stealing," he did hear him say that he "had $117 on that counter and you're the only one that checked out at that time and the money is gone" and "did you get it?"

There was no proof that the plaintiff had suffered any special damages, but near the end of the case, the court, over objection, allowed her to introduce into the evidence a financial statement of the net worth of the defendant.

On the other hand, the store manager, testifying on behalf of the defendant, stated that in a normal voice he asked the customer if it was possible that the cashier had "given her the money" or put it in her package and that he had no reason to believe she had taken the money. The cashier also testified, but her testimony in the main concerned the misplacement of the money and the finding of it. And there were no other witnesses on either side.

At the close of the evidence offered by the plaintiff, the defendant moved for a directed verdict by way of separate motions. In one it was asserted that there was a material variance in the evidence between the alleged actionable words in the declaration and those shown by the evidence to have been used by the store manager. The second motion stated that the plaintiff failed to show that the store manager had charged her with or imputed to her any improper or illegal conduct, that the plaintiff had produced no evidence which entitled her to recover any damages, and that the evidence showed that the manager had never at any time used any words from which it could be inferred that he had charged the plaintiff with a crime. Both motions were denied, and, at the conclusion of the whole case, both were renewed and again denied.

In its instructions to the jury, the court, after explaining that the plaintiff had the burden of proving that she had been slandered, in effect informed the jury that if the plaintiff had not convinced it that the store manager had accused her of larceny, then the verdict should be for the defendant. But the jury was in effect further informed that if it found from the words, actions and conduct of the manager that he had charged her with larceny, then the verdict should be for the plaintiff, and that, in such event, it could award her such punitive damages as would be reasonable and proper under the circumstances. The defendant did not object to the instructions. The subsequent motion for a judgment *n.o.v.*, or, in the alternative, for a new trial, was denied, and this appeal followed.

On appeal the defendant contends: (i) that the words, actions and conduct of the store manager were not slanderous *per se;* (ii) that the determination of whether the words, ac-

tions and conduct were slanderous *per se* was a matter of law for the court; (iii) that there was a material variance between the words alleged and the words proved; (iv) that the plaintiff failed to prove actual malice; and (v) that the admission in evidence of the financial worth of the defendant was erroneous.

At the outset we notice that the defendant, by declining to demur to the amended declaration, did not seek a preliminary determination as to whether the claim for damages was based on slander *per se* or on slander *per quod*. As a consequence, the plaintiff, in that she made no effort to prove special damages and instead laid a foundation for punitive damages, ostensibly tried the case on the assumption that she had stated a proper case of slander *per se*. Moreover, it appears that the defendant may have gone along with that theory, at least up to the time it first moved for a directed verdict. Even then, other than the assertion that there was a variance between the things alleged and the things proved and the claim that there had been no proof of any damages, the basis for the other reasons assigned, as to why there should be a directed verdict, is not clear to us, but we assume the defendant intended to assert that there was no proof of either slander *per se* or slander *per quod*. Furthermore, it may be that the lower court, in overruling the motions for a directed verdict, and, in submitting to the jury the question of whether the plaintiff had been slandered, was itself uncertain as to whether the words and behavior of the store manager were in fact slanderous. But be that as it may, the questions presented on appeal must be decided on what the record before us shows.

### (i) and (ii)

Inasmuch as these two questions are interrelated, we shall consider them together, for in both the basic claim is that the words and behavior of the store manager were not slanderous *per se*. But we do not agree.

The historical distinction between slander *per se* and slander *per quod* is undoubtedly based on the theory that in words actionable *per se,* their injurious character is a fact of common notoriety, and necessarily import damages not requiring proof

of special damages (cf. *Foley v. Hoffman,* 188 Md. 273);
while, if the words used are not defamatory *per se,* they must
be explained by innuendo and colloquium (cf. *Walker v.
D'Alesandro,* 212 Md. 163). See *Odgers on Libel and Slander*
(Am. Ed. by Bigelow), p. * * * 309.

Consistently this Court has held that words which falsely
charge a person with or impute to him the commission of
a crime for which he is liable to be prosecuted and punished
are actionable *per se.* See, for example, the early case of
*Dorsey v. Whipps,* 8 Gill 457, 462 (1849), where, in quoting
1 *Starkie on Slander,* p. 43, it was said: " 'To impute any
crime or misdemeanor, for which corporal punishment is to be
inflicted, is actionable without proof of special damage.' " And
see *Haines v. Campbell,* 74 Md. 158, 21 Atl. 702 (1891),
where it was stated that if spoken words convey an implication
of crime, they are actionable in whatever mode their meaning
may be expressed, that is, whether by way of interrogation,
insinuation, ironic praise or any other form of speech under-
stood by the hearers. See also *Wheatley v. Wallis,* 3 H. & J.
1 (1810); *Bonner v. Boyd,* 3 H. & J. 278 (1811); *Long v.
Eakle,* 4 Md. 454 (1853); *Shockey v. McCauley,* 101 Md.
461, 61 Atl. 583 (1905). Other cases in this area are collected
in 14 M. L. E., *Libel and Slander,* § 14 (Commission of
Crime).

It may well be that the words—"did you get [or pick up]
the $117 that was on the counter"—do not in and of them-
selves carry an imputation of having stolen the money. But
there is no requirement that the defamatory words must em-
body an outright accusation of the commission of a crime, for
"[i]n cases of slander, words take their actionable character
from the sense in which they appear to have been used, and
that in which they are most likely to be understood by those
who hear them." *Garrett v. Dickerson,* 19 Md. 418, 447
(1863). And if the slanderous words used are such as in or-
dinary "lay conversation" will impute, or be understood to
impute guilt, that is sufficient to make them actionable *per se.*
*Blumhardt v. Rohr,* 70 Md. 328, 17 Atl. 266 (1889). Cf.
*Pollitt v. Brush-Moore, Etc., Inc.,* 214 Md. 570, 575, 136 A.
2d 573 (1957).

14

Thus it appears that in some cases, such as this one, it is necessary to look into the accompanying circumstances at the time the alleged defamatory words were spoken in order to determine whether the words are slanderous *per se*. See 53 C.J.S., *Libel and Slander*, § 70 a (2), p. 117, where it is said:

"Words charging a taking of property do not of themselves convey an imputation of larceny, since the property might reasonably have been taken under a claim of right, or through mistake, or in sport; but if it appears from the connection in which the charge was made or the circumstances attending its utterance that it was intended and understood to impute the crime of larceny it will be regarded as actionable per se."

See also 36 C.J., *Libel and Slander*, § 140 ddd. And see *Cotton v. Fisheries Products Co.*, 97 S. E. 712 (N. C. 1919); *Sawyer v. Gilmers*, 126 S. E. 183 (N. C. 1925); *Dean v. Black & White Stores*, 55 S. W. 2d 500 (Ark. 1932); *Goodman v. Phillips*, 235 S. W. 2d 537 (Ark. 1951).

Nor did the fact that there was an innuendo or colloquium, for which there was no need, affect the actionability *per se* of the words and behavior of the store manager. For where an innuendo and colloquium are used in connection with words which are unequivocal and actionable *per se*, they may be treated as surplusage. See *Thompson v. Upton*, 218 Md. 433, 146 A. 2d 880 (1958). Cf. *Blumhardt v. Rohr, supra* (70 Md. 335). And see *Bowie v. Evening News*, 148 Md. 569, 579, 129 Atl. 797 (1925), stating the office of an innuendo.

If the words and behavior are actionable *per se*, it is, of course, unnecessary to either allege or prove special damages. Cf. *De Witt v. Scarlett*, 113 Md. 47, 77 Atl. 271 (1910); *Foley v. Hoffman, supra*. And see 1 Poe, *Pleading and Practice* (Tiffany's Ed.), §§ 174, 175.

In the instant case, the jury accepted the version of the customer as to what had taken place and concluded that the store manager had accused the customer of larceny. And, inasmuch as it is evident that the words the manager chose to use in speaking to the customer, with regard to the misplaced

money, when considered with all of the attending circumstances, including the insolent behavior of the manager, constituted slander *per se,* the refusal of the lower court to grant the motion for a judgment *n.o.v.* was proper.

With respect to the further contention concerning actionability *per se,* we agree that ordinarily it is the responsibility of the court, when required to do so, to rule as a matter of law (and not the duty of the jury to find as a fact) whether the words and behavior of a speaker are actionable *per se.* But inasmuch as there was no objection to the instructions, we need not decide in this case whether the slanderous *per se* character of the alleged defamatory words and behavior were properly submitted to the jury.

### (iii)

On the question of whether there was a material variance between the words alleged—"did you get the $11?"—and the words proved—"did you pick up that money"—we think that the variance, such as it was, was immaterial. The former strict rule requiring a plaintiff in an action of slander to prove the exact words alleged in the declaration in order to avoid a fatal variance has long since been relaxed. It is now sufficient if the proof is in substantial accord with the alleged defamatory words. See the Annotation: *Variance-Defamatory Words,* 2 A.L.R. 367. And see Poe, *op. cit.,* § 176, where it is pointed out that "a slight and unimportant disagreement between the allegation and proof will not make the declaration defective as for a variance." Cf. *Robinett v. Ruby,* 13 Md. 95 (1859), where the variance was immaterial. While the words "get" and "pick up" are not synonymous, they are by no means so dissimilar as to have opposite meanings when used colloquially. One of the original meanings of "get" was "take hold of" and in that sense there would seem to be little, if any, distinction between "taking hold of" the money on the counter and "picking up" the money from the counter.

### (iv)

Claiming that the facts show a qualified privilege on the part of the store manager, the contention here is that the

16

customer was required to prove actual malice. But, aside from the fact that the record does not disclose that the question was ever raised below, the presumption, when the defamatory words are actionable *per se,* is that they were maliciously uttered, in the absence of satisfactory proof—and we find none in the record—of the existence of a qualified privilege. See the cases collected in the third, fourth and fifth footnotes of 14 M.L.E., *Libel and Slander,* § 92.

(v)

Since it is conceded that punitive damages are permitted when the defamatory words are actionable *per se* (cf. *Simon v. Robinson,* 221 Md. 200, and see *Shockey v. McCauley, supra*), it follows, as the defendant further acknowledges, that evidence of financial worth was admissible in this case.

For the reasons stated herein, the judgment will be affirmed.

*Judgment affirmed; appellant to pay the costs.*