Jackie R. SAUERHOFF

v.

The HEARST CORPORATION.

Civ. No. 72–1189–K.

United States District Court,
D. Maryland.

Dec. 19, 1974.

Morgan L. Amaimo, Baltimore, Md., for plaintiff.

James J. Doyle, Jr., John B. Jaske, Sherbow, Shea & Doyle, Baltimore, Md., for defendant.

FRANK A. KAUFMAN, District Judge.

In Casale v. Dooner Laboratories, Inc., 503 F.2d 303 n. 4, (4th Cir. 1973), Judge Craven noted, apparently with thankfulness, that in that case the Court

> . . . need not delve into the somewhat cloudy Maryland distinction between libel "per se" and "per quod." *See* Murnaghan, *From Figment to Fiction to Philosophy—The Requirement of Proof of Damages in Libel Actions,* 22 Cath.U.L.Rev. 1 (1972).

In this case this Court is not in so comfortable a position. For herein the irrational animals known as libel "per quod" and libel "per se", and the Merlinesque touchstones which attach to them, must be identified, whether or not their existence can be rationally justified. Those two animals had their birth in a common law pleading containing a section in which damages were to be specified. That section was introduced by the phrase "per quod", and was inapplicable whenever damages were presumed as they originally were at common law in all libel actions and in the special categories of slander.[1] Accordingly, the draftsmen in cases in which damages were presumed would simply insert the words "per se" where the phrase "per quod" would otherwise appear. All slander actions except those which fell into the special categories required specification of damage, and came to be known as slander per quod. As centuries went by the "per quod" approach found its way, at least to some degree in some jurisdictions, into the law of libel. Murnaghan, *supra* at pp. 4, 13.

---

[1] Four such special categories are generally recognized today, *i. e.,* charge of a crime, imputation of a loathsome disease, injury to the plaintiff in his office, trade or business, or impugning the chastity of a woman. Murnaghan, *supra* at p. 4 n. 6. *But see* the discussion at p. 124, *infra* of this opinion. ion.

Commenting upon that development, Restatement (Second) of Torts, § 569(c) (Tent.Draft No. 20, 1974)[2] states:

> Some courts have taken the position that a libellous publication is not actionable per se if its defamatory meaning is not apparent *without reference to extrinsic facts*. This minority rule, which would require proof of special harm if the libel is not found to be actionable per se, is not approved. One reason offered for its acceptance was that the defendant might not himself have known of the extrinsic facts and would therefore be held liable although innocent. This argument will be eliminated if the Supreme Court holds that liability for innocent defamation is unconstitutional. (See § 580).[3] [Emphasis supplied.]

In introductory remarks to the aforementioned *Tentative Draft*, the booklet containing the same made available in advance of the May 1974 Annual Meeting of the American Law Institute contains the following commentary (at p. xiv):

> §§ 569 et seq. The big problem here is that of libel per quod—a written communication which is not libellous on its face but requires a knowledge of the inducement, or extrinsic facts, to realize its defamatory character. This was the subject of the famous Prosser-Eldredge debate which spilled over into the law reviews and made Institute history. Dean Prosser wanted to make libel per quod not defamatory per se (so that special damages would have to be proved). Mr. Eldredge wanted to hold to the original common rule that all libel is defamatory per se. When the problem came up on the Institute floor the last time, a compromise solution was tentatively adopted, to the effect that proof of special damages would not be required if the defendant knew or should have known of the extrinsic facts; otherwise the proof would be required. The solution here offered is to go back to the provisions of the First Restatement. If you approve, Mr. Eldredge is entitled to the laurel wreath of victory. The compromise had been an attempt to reform the law of libel by eliminating part of its harsh application of strict liability, but it would have succeeded in doing only a partial job. The Supreme Court now is apparently prepared to hold that strict liability violates the First Amendment. (See § 580). The decision has been to leave the issue of strict liability to treatment in § 580. Case authority since the Institute last lacted [sic] has been divided but has leaned rather heavily in the direction of holding all libel to be defamatory per se.[4]

2. Hereinafter referred to as the *Tentative Draft*.

3. The language quoted from § 569(c) of the *Tentative Draft* does not appear in the Restatement of Torts § 569(c) (1938). The 1938 edition, however, authorizes damages in all libel cases, whether or not the defamatory character of the language is facially apparent or requires proof by extrinsic facts. *See* Murnaghan, *supra* at pp. 1–2. As to § 580 of the *Tentative Draft*, see n. 4 *infra* of this opinion.

4. Section 580 of the *Tentative Draft* provides: INTENTION, NEGLIGENCE AND STRICT LIABILITY FOR DEFAMATION.
 ONE WHO PUBLISHES A FALSE COMMUNICATION WHICH DEFAMES ANOTHER, AND WHICH IS NOT ON A MATTER OF PUBLIC OR GENERAL INTEREST, IS SUBJECT TO LIABILITY TO THE OTHER IF HE
 (a) KNOWS OF THE FALSITY AND DEFAMATORY CHARACTER OF THE COMMUNICATION
 (b) ACTS RECKLESSLY IN DISREGARD OF THESE MATTERS, OR
 (c) ACTS NEGLIGENTLY IN FAILING TO ASCERTAIN THEM.
 *Caveat:* The Institute expresses no opinion to whether the traditional common law rule, subjecting the publisher of a defamatory communication to strict liability, may be consistent with the First Amendment in any situations, and, if so, in which ones.

Insofar as current Maryland law is concerned, this Court is in agreement with and adopts the conclusion set forth in Murnaghan, *supra* at p. 25, that although "[i]t is only a guess", "it appears likely that, if the issue actually is presented for decision," Maryland's highest court will reject the Restatement view in favor of Dean Prosser's position, often expressed in Maryland dictum, that whenever the libelous character of the words is not evident upon their face and extrinsic facts must be alleged and proven, then the libel is "per quod" and not "per se" and special damages[5] must be proven.[6] However, this Court's best guess is that Maryland's highest court would not, as Dean Prosser further suggests, recognize an exception to that general rule for remarks which, although libelous per quod, would have fallen into one of the special slander per se categories.[7] While there are opinions relating to defamation which have been filed by the Court of Appeals of Maryland since Heath v. Hughes, 233 Md. 458, 197 A.2d 104 (1964), none of them seems clearly to have moved the Court away from the following pronouncement in *Heath* (at 463, 197 A.2d at 106):

\* \* \* It is well settled that if the language used is not defamatory *per se*, the plaintiff is required to allege and prove that special damages resulted from the publication. Bowie v. Evening News, 148 Md. 569, 129 Atl. 797; DeWitt v. Scarlett, 113 Md. 47, 77 Atl. 271; 1 Poe, Pleading and Practice (Tiffany's ed.), §§ 174, 572. In this case there is neither allegation nor proof of any special damages. Thus if the alleged defamatory letter is actionable at all, it must be actionable *per se*. \* \* \*

In Novick v. Hearst, 278 F.Supp. 277, 279 (D.Md.1968), Judge Harvey wrote:

\* \* \* It is clear, however, under Maryland law that if the language used is not defamatory *per se*, the plaintiff is required to allege and prove that special damages resulted from the publication. Heath v. Hughes, 233 Md. 458, 463, 197 A.2d 104 (1964); Bowie v. Evening News, 148 Md. 569, 129 A. 797 (1925).
\* \* \* \*[8]

---

5. The damages which must be alleged and proved when the defamation does not fall into a per se category are known as "special damages", as opposed to "general damages" which the law presumes to have occurred, at least nominally, when a per se defamation is involved. " 'Special' damages, however, do not comprise all provable harm flowing from a publication and capable of compensation by money award, but rather are restricted to direct pecuniary loss. W. Prosser, Handbook of the Law of Torts § 112, at 760 (4th ed. 1971) . . . ." Murnaghan, *supra* at p. 2 n. 4.

6. The use by the Restatement in its above-quoted comment to section 569 of the adjective "minority" to describe what this Court believes to be Maryland's rule is seemingly challenged by Mr. Murnaghan who (at 16) characterized "Maryland decisional law" as "typical of" the law of—

. . . most of the American jurisdictions in its dealings with the issue of the necessity of *allegations and proof* of damages where extrinsic facts are necessary to establish the libelous character of words sued on. [Emphasis supplied.]

*See, e. g.,* Barton v. Barnett, 226 F.Supp. 375, 377 (N.D.Miss.1964), in which the Court, construing Mississippi law, wrote:

Since the publications charged here are not actionable per se there can be no recovery of nominal or general damages.
\* \* \*
*See also* W. Prosser, Handbook of the Law of Torts § 112 (4th ed. 1971).

7. "If the imputation falls into one of the four special slander categories, it is actionable without proof of special damage. If it does not, there can be no recovery unless special damage is pleaded and proved." (Footnotes omitted.) W. Prosser, Handbook of the Law of Torts § 112, at 763 (4th ed. 1971). *See* Murnaghan, *supra* at pp. 2–4.

8. Nothing which the Court of Appeals of Maryland or the Court of Special Appeals of Maryland have written in Harnish v. Herald-Mail Co., 264 Md. 326, 286 A.2d 146 (1972); A. S. Abell Co. v. Barnes, 258 Md. 56, 265 A.2d 207 (1970), cert. denied, 403 U.S. 922, 91 S.Ct. 2224, 29 L.Ed.2d 700 (1971); Greenbelt Coop. Pub. Assn. v. Bresler, 253 Md. 324, 252 A.2d 755 (1969), rev'd, 398 U.S. 6, 90

It does not appear that Maryland case law recognizes any exceptions to the general rule requiring proof of special damages, even *in instances in which the libelous remarks would, if spoken, have fallen within one of the traditional slander per se categories.* As Mr. Murnaghan suggests, it would appear that in Maryland "[t]his is a distinction not expressed or recognized by the courts." Murnaghan, *supra* at p. 3 n. 5.[9]

It is against the aforegoing legal background that the facts of the within case must be framed. On October 27, 1971, the Baltimore *News American*, a Hearst newspaper, published the following article:

### Boyfriend Sues for Raffle Prize

#### $$ Sweeter Than Love?

Although Lady Luck apparently favored Jackie R. Sauerhoff, his girlfriend appears to have soured on him, according to a suit filed in Circuit Court Tuesday.

Sauerhoff of the 1100 block Haverhill Road says in his suit that he bought a $10 raffle ticket last month while he and his girlfriend, Miss Linda Adams, of the 3700 block Clarinth Road, were working in the offices of the Masters, Mates, and Pilots Union.

The suit, filed by attorney Wildon [sic] Leroy Maddox, says Sauerhoff allowed Miss Adams to put her name on the ticket with the verbal agreement they would share the $4,000 prize if fortune smiled on them.

The ticket turned out to be the winning one, but Miss Adams has since deposited the prize in the Pikesville branch of the Maryland National Bank, refuses to give Sauerhoff his share, and is planning to leave the state, the suit says. The bank is named as a defendant as well as Miss Adams.

Judge Anselm Sodaro signed a temporary restraining order forbidding the bank from paying Miss Adams the money should she request it, as well as forbidding her from receiving the money. No hearing date has been set.

 Sauerhoff, a citizen of Maryland and a married man, instituted this case in the Superior Court of Baltimore City, seeking a jury trial, asking for compensatory damages and alleging in substance that the News American article falsely imputed to him extra-marital sexual conduct. Defendant removed the case to this Court pursuant to 28 U.S.C. §§ 1441, 1446. Motions for summary judgment have been filed by both sides. On the present state of the record, there are controverted facts as to whether the defendant published the article with reckless disregard of the implication that Sauerhoff, a married man, had established an extra-marital relationship with Miss Adams and as to whether the communication was in fact understood by readers in that sense.[10]

"Initially, it is for the court [under Maryland law] to determine the defamatory nature of the writing, to decide 'whether the words charged in the declaration amount in law to libel. . . . .' Brinsfield v. Howeth, 107 Md. 278, 284 (1908)." Casale v. Dooner Laboratories, Inc., *supra*, 503 F.2d at 307. Whether the words in the article in question, coupled with the extrinsic fact that Sauerhoff was a married man, can support the necessary innuendo is thus to be determined by the Court which determines "whether a communication is capable of bearing a particular meaning" and "whether that mean-

---

S.Ct. 1537, 26 L.Ed.2d 6 (1970) ; Koren v. Capital-Gazette Newspapers, Inc., Md.App., 325 A.2d 140 (1974), would appear to throw any additional light on the issue.

9. Foley v. Hoffman, 188 Md. 273, 52 A.2d 476 (1947), cited by Dean Prosser in support of a slander per se exception to Maryland's special damage rule, certainly does not clearly establish such an exception. *See* Murnaghan, *supra* at pp. 19, 20 n. 75.

10. There are also conflicting affidavits as to whether Sauerhoff's attorney in the state court case brought against Miss Adams, and his original attorney herein, described Miss Adams to a reporter as Sauerhoff's "girlfriend".

ing is defamatory." If the answers to both of those inquiries is "yes", then the jury determines "whether . . . [the] . . . communication, capable of a defamatory meaning, was so understood by its recipient." § 614 of the Tentative Draft. In the opinion of this Court the article can be read by innuendo as meaning that Miss Adams and Sauerhoff were having an extra-marital affair. "[W]hile the office of the innuendo is to connect the defamatory matter with the other facts set out, so as to show the meaning and application of the charge, it cannot enlarge or restrict the natural meaning of the words, or introduce new matter." Phillips v. Union Indemnity Co., 28 F.2d 701, 702 (4th Cir. 1928) (Soper, J.).[11] In this case no enlargement of the natural meaning of the words of the article is required.

## I.

■ Sauerhoff has alleged that his wife left him as a proximate result of the publication of the article and that he has suffered impairment of his health, mental and physical; the lost esteem and companionship of associates and of his community; a loss of consortium; and the loss of the domestic services of his wife. Unless the imputation of lack of chastity of a married male brings this case into one of the categories of libel in which no special damage need be alleged, only the last allegation of damage is cognizable as special or pecuniary damage. The loss of consortium would not seem so to qualify. *See* Deems v. Western Maryland Ry., 247 Md. 95, 100, 231 A.2d 514 (1966); Lynch v. Knight, 9 H.L.Cas. 577, 5 L.T. 291 (1869). Nor would Sauerhoff's alleged losses of conjugal society, companionship or of self- or communal esteem seem to qualify as pecuniary loss.[12] But the alleged loss of

domestic services would appear to be damage cognizable as special or pecuniary and similar to the loss of an advantageous marriage which has been said to comprise special damage. W. Prosser, Handbook of the Law of Torts § 112, at 761 n. 5 (4th ed. 1971); J. P. Poe, Pleading and Practice § 174 (Tiffany's ed.), cited approvingly in Heath v. Hughes, 233 Md. *supra* at 463, 197 A.2d 104 and DeWitt v. Scarlett, 113 Md. 47, 52, 77 A. 271 (1910).

■ Accordingly, Sauerhoff's *allegation* of loss of domestic services of his wife appears to meet his *pleading* burden under Maryland law even if the alleged impugning of his chastity does not itself constitute special damage. But if such impugning does not constitute special damage and Sauerhoff's only allegation of special damage relates to loss of his wife's domestic services, Sauerhoff then has the burden of proving at trial that he has suffered special or pecuniary loss from the loss of those services. And in this case he has in fact established by his own deposition testimony that he suffered no such loss. Sauerhoff's deposition, taken by defendant on January 31, 1974 and filed herein pursuant to Federal Civil Rule 56(c), discloses that Sauerhoff states that the facts were as follows on that date:

(1) Sauerhoff resides with his sister whose services, he contended, are worth $100 per week. However, he pays his sister only $25 per week for his room and board.

(2) Sauerhoff's wife, during their marriage, had the use of her own automobile, a 1967 Chevrolet worth $400, which Sauerhoff purchased for her.

(3) Sauerhoff and his wife jointly owned and used, during their marriage, furniture originally valued at $1700

---

11. Those words in the *Phillips* opinion were also quoted and relied upon in Maas v. National Cas. Co., 97 F.2d 247, 249 (4th Cir. 1938).

12. *See* W. Prosser, Handbook of the Law of Torts § 112, at 760–61. *But see* the discussion at pp. 126–127, *infra*.

which Sauerhoff purchased and paid for.[13]

(4) Sauerhoff gave his wife $400 at the time of her departure and thereafter gave her $1800.

(5) Sauerhoff was not making any monetary payments to his wife.

(6) Sauerhoff pays no alimony or child support.

(7) During their marriage, Sauerhoff's wife worked on only one occasion in order to obtain funds with which to purchase certain specific household items.

(8) The aforementioned losses constitute the sole financial damage to Sauerhoff attributable to his wife's absence.

(9) During the marriage Sauerhoff paid all expenses for the support of his wife and her two children by a previous marriage other than as indicated in (7) above.

(10) Sauerhoff's estimates of his expenses while supporting his wife and her children are as follows:

| | |
|---|---|
| $2220 per year | — lodging (rent and utilities) |
| $3380 per year | — food (for himself and family) |
| $600–$900 per year | — clothes (wife) |
| $1200–$1800 per year | — clothes (children) |
| $70 per year | — insurance (wife's car) |
| $400–$500 per year | — upkeep (wife's car) |
| $100 per year | — Christmas presents (children) |
| $200 per year | — Christmas presents (wife) |

Those expenses total at least $8170 per year.

It is clear that in the two years after Sauerhoff was separated from his wife, he saved rather than lost money. That conclusion holds true even if Sauerhoff's sister's services are valued at $100 per week and not at the figure Sauerhoff actually pays, i.e., $25.00. And in that connection, this Court is assuming, *arguendo*, in the context of the defendant's summary judgment motion, that there should be included on the cost side the value of all payments, in goods and mon-

ey, which Sauerhoff made to his wife, without regard to the possible lack of any legal compulsion upon Sauerhoff to make those payments.

Sauerhoff points out that he may in the future be required to pay alimony and child support. The question arises as to whether that possibility poses a basis for an assertion by Sauerhoff of additional damages and entitles him to have a chance to prove to the jury that he has sustained, on a net basis, pecuniary damage through the loss of his wife's domestic services. The possibility that Sauerhoff will be required to make any such payments and that any such payments added to Sauerhoff's extra expenses because of the loss of his wife's services would attain a total greater than his savings attributable to living separately from his wife is however so speculative and conjectural as not to be legally cognizable. *Cf*. Adams v. Benson, 208 Md. 261, 270–271, 117 A.2d 881 (1955); Mount Royal Cab Co., Inc. v. Dolan, 166 Md. 581, 584, 171 A. 854 (1934).[14] In that regard, it is also to be noted that if Sauerhoff's wife left him because of an unfounded newspaper article, she would seemingly be deemed to have deserted Sauerhoff and thus not entitled to alimony. *Cf*. Stein v. Stein, 251 Md. 300, 247 A.2d 266 (1968); Wood v. Wood, 227 Md. 211, 176 A.2d 229 (1961). Further, while Sauerhoff's wife had children by a former marriage, Sauerhoff never adopted them; thus, it is likely that he would not be required to pay child support after separation or divorce. *Cf*. Weaver v. Garrett, 13 Md. App. 283, 286 n. 1, 282 A.2d 509 (1971). Finally, those payments, if required, might or might not exceed the expenses Sauerhoff bore during his marriage which related to those children. In sum, Sauerhoff himself has testified under oath that he has suffered no pecuniary loss. Accordingly, pursuant to the re-

13. Sauerhoff's wife took both the automobile and the furniture with her when the marriage broke up.

14. *See* Murnaghan, *supra* at pp. 2–3, 31, 37; 2 E. J. Devitt & C. B. Blackmar, Federal Jury Practice & Instructions § 78.08 at 201 (1970); Prosser, *supra* n. 12, § 112, at 760–61; 12 C. McCormick, Handbook on the Law of Damages §§ 114–15 at 419–22 (1935).

quirement embedded in Maryland libel law requiring proof of special damages, *see* pp. 120–121, *supra,* Sauerhoff's own testimony entitles the defendant Hearst to the grant of its motion for summary judgment.

Further, even assuming, *arguendo* that Dean Prosser's views as set forth hereinabove fully reflect Maryland law, a similar result would follow. Today, under Maryland law, at least three of the four special categories of slander [15] would appear to be actionable without allegation or proof of special damage. *See* American Stores Co. v. Byrd, 229 Md. 5, 181 A.2d 333 (1961) (imputation of crime); Hopkins Chemical Co. v. Read Drug & Chemical Co., 124 Md. 210, 215, 92 A. 478, 480 (1914) (". . . imputation upon [one] in respect of his office, profession, or trade . . ."); 8A Md.Ann.Code art. 88, § 1 (1957) (relating to the impugning of the chastity of a woman).

In the Tentative Draft §§ 571 Comment g and 574 Comment c, the view is stated that adultery or fornication is a crime of moral turpitude, and thus actionable without reference to form of punishment, and that a charge of adultery or fornication requires no proof of special damages to establish slander, whether the charge be against a *man* or *woman.* If that view had been adopted by Maryland's courts, resolution of the differences between Dean Prosser and Mr. Murnaghan would be central to this case. However, Maryland law has apparently never adopted such a view. Rather, in Maryland, prior to 1838, spoken words, "no matter how gross," which impugned the chastity of a *female,* either married or unmarried, did not support an action for slander without proof of special damage. *See* Hemming v. Elliott, 66 Md. 197, 198, 7 A. 110 (1886); Shafer v. Ahalt, 48 Md. 171, 173 (1878); Griffin v. Moore, 43 Md. 246, 251–252 (1875). In *Shafer,* the

Court of Appeals of Maryland held that an action by a married woman against the defendant for stating that she had committed adultery with him did not allege slander per se because it alleged the offense of adultery—"a *spiritual offense* cognizable by the *Spiritual Courts*"—not an offense which "subjects the party to *corporal punishment*" which is required "in order to render the words actionable *per se.*" 48 Md. *supra* at 173 (emphasis in original). Although adultery is today punishable only by a $10 fine in Maryland, *see* 3 Md.Ann.Code art. 27, § 4 (1971 Replacement Vol.), Maryland legislation has in effect seemingly rejected the views expressed in *Shafer.* Thus, in 1838 the Maryland legislature, by statute, created in favor of unmarried women a cause of action for slander, even in the absence of special damage. Ch. 114 of the Laws of Md. (1838). *See* Griffin v. Moore, 43 Md. 246, 252 (1875). In 1888 the Maryland legislature extended that opportunity to married women. Ch. 444 of the Laws of Md. (1888).[16] 8A Md.Ann.Code art. 88, § 1 (1969 Replacement Vol.) provides:

> All words spoken falsely and maliciously touching the character or reputation for chastity of any woman, whether single or married, and tending to the injury thereof shall be deemed slander, and shall be treated as such in the several courts of law in this State.

■ Nonetheless, no similar Maryland legislation has yet created a similar slander per se cause of action for males whose chastity or fidelity has been impugned, so that in any event the allegedly libelous remarks concerning Sauerhoff would not, if spoken, have fallen within a special or slander per se category.

## II.

The Tentative Draft, in proposing the broadening to include men of the special

---

15. *See* discussion at pp. 118–119, *supra.*

16. The 1888 statute also created certain rights in a separate section which apparently is a predecessor of 8A Md.Ann.Code art. 88, § 4 (1969 Repl.Vol.), in favor of husbands with regard to alleged defamatory remarks about their wives.

damage category relating to chastity of women, discusses in comment c to section 574 possible federal constitutional requirements relating to sex equality. The question accordingly arises whether Maryland's failure to provide a male with a presumption of special damages when his marital fidelity has been impugned is violative of the Fourteenth Amendment's Equal Protection Clause.

■ In light of the concern of the draftsmen of the Restatement and in view of the Supreme Court's expressed sensitivity to legal classifications based solely upon gender,[17] it cannot be said that the sexual discrimination issue presented in this case is by any means wholly insubstantial or frivolous. Nonetheless, this Court concludes that any sex preference accorded by Maryland law is not violative of constitutional norms.

To begin with, it is to be noted that the Maryland statute creating the slander per se category in question does not, for the mere sake of judicial convenience, deny a Maryland male the right to recover for damage to his reputation flowing from a libelous remark, while according to a female such a right. *Cf.* Frontiero v. Richardson, 411 U.S. 677, 690, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). At the utmost Article 88, § 1 erects a presumption that a female whose "character or reputation for chastity" has been impugned has been harmed, while refusing to erect such a presumption as to a male. Whether the conventional equal protection stand-

ard, under which a classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation," Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225, *quoting* Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920), or whether a more heightened scrutiny [18] be applied to such a statute, the statute would nevertheless seem to pass constitutional muster and to be unlike the mandatory preference accorded males for appointment as executors to decedents' estates which was declared arbitrary and thus unconstitutional (404 U.S. at 76, 92 S.Ct. 251) in Reed v. Reed, *supra*. Put simply, what the statthe reflects is society's longstanding acceptance of the view that the reputation of a woman accused of adultery or unchastity is more likely to be scarred than that of a similarly impugned male.[19]

### III.

■ As if the libel per quod and the sex issues in this case were not in themselves sufficiently mind-boggling, there has been presented in this case a third issue of the same dimension and perhaps of even greater significance. That issue, one within the realm of the First Amendment, is whether the article in this case reported an "[e]vent or occurrence which involves an issue of public or general concern". Tentative Draft §

---

17. *See, e. g.,* Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) ; Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

18. *See* the opinions of Mr. Justice Brennan in Kahn v. Shevin, 416 U.S. 351, 357, 94 S.Ct. 1734, 1738, 40 L.Ed.2d 189, 194–95 (1974) (dissenting), and in Frontiero v. Richardson, *supra* n. 17, 411 U.S. at 688, 690, 93 S.Ct. 1764 referring to the "strict judicial scrutiny" test. That test was applied in *Frontiero* by the four Justices, including Mr. Justice Brennan, who joined in the plurality opinion therein.

19. The *Tentative Draft's* draftsmen have noted : "If the Constitution is held to require that they [men and women] be treated similarly [as to slander per se], there is presently no indication as to which application of the rule would have to be changed." *Tentative Draft, supra* at 83. Thus, if this Court were to hold Maryland's presumption of harm unconstitutional, it would then be required to predict whether the Court of Appeals of Maryland would, faced with the choice, extend the slander per se category to include men as well as women, or eliminate it as to both. Although sheer guessing is involved, the latter result would appear not unlikely in this day and age.

581B[20] comment e at 144. If so, the question arises as to whether the defendant is entitled to the protection accorded by the privilege of New York Times Co. v. Sullivan, 376 U.S. 254, 279–280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and thus, in this case, to the grant of its motion for summary judgment on that ground alone unless plaintiff could establish publication of the alleged libel "with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."[21]

In Gertz v. Welch, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), Mr. Justice Powell seems to have concluded that publishers of defamations concerning purely private individuals such as Sauerhoff, even when such individuals become enmeshed in matters of public interest, are not constitutionally entitled to the broad protections of the *New York Times* standard, and that private individuals, unlike public officials, "lack effective opportunities for rebuttal", and do not, as do "public figures", "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.* 418 U.S. at 345, 94 S.Ct. at 3009–3010, 41 L.Ed.2d at 808. It is true that Mr. Justice Powell strongly suggested in *Gertz* (418 U.S. at 348, 94 S.Ct. at 3011, 41 L.Ed.2d at 810), that it might be constitutionally impermissible "if a State purported to condition civil liability on a factual misstatement whose content did not warn a reasonably prudent editor or broadcaster of its defamatory potential." However, even conceding that summary judgment procedures are an essential protection for First Amendment rights, *see* Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 52–53, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (plurality opinion of Mr. Justice Brennan); Washington Post Co. v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965, 967–68 (1966), in this case, there would appear to be presented a triable issue of fact as to whether the subject matter of the article would or would not have so warned the reasonably prudent editor of some defamatory potential.

Nor is defendant entitled to the grant of summary judgment on the strength of *Gertz's* holding (418 U.S. at 349, 94 S.Ct. at 3011, 41 L.Ed.2d at 810) "that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Sauerhoff* seeks no punitive damages herein. As indicated *supra*, Sauerhoff has suffered no pecuniary damages sufficient to constitute special damages under Maryland law. In that context, defendant argues that the only damages Sauerhoff could conceivably recover in any event would be presumed damages which are constitutionally proscribed by *Gertz*. However, even if it be assumed that a showing of reckless disregard could not be made in this case sufficient to allow the recovery of presumed damages, an assumption this Court does not make in the present summary judgment posture of this case, *Gertz* makes it clear (418 U.S. at 349, 94 S.Ct. at 3012, 41 L.Ed.2d at 811) that a state might constitutionally allow a plaintiff to recover for "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." And although under Maryland law such injury would not appear to suffice as special damage necessary to support an action for libel per quod,[22] if such an action were otherwise

---

**20.** This section of the *Tentative Draft* is new in that it has no parallel in the 1938 Restatement of Torts.

**21.** Because this Court is granting herein defendant's summary judgment motion for other reasons, it is not *necessary* for this Court to reach the *New York Times* issue. But it would appear advisable for this Court so to do so that if this Court's determinations on the grounds set forth *supra* are not upheld on appeal, the *Times* issue, and this Court's views as to the same, may also perhaps be the subject of appeal.

**22.** *See* p. 122, *supra*; Murnaghan, *supra* at p. 2 n. 4.

proper such damages seemingly would be recoverable in Maryland in a case like this one. *See* Nolan v. Traber, 49 Md. 460, 462, 470 (1878). *See generally* 1 F. Harper & F. James, The Law of Torts § 5.30, at 470 (1956); Prosser, *supra* at 760–61. Therefore, defendant cannot gain the summary judgment it seeks, solely under the doctrine of *New York Times* and its growing progeny including *Gertz*. Nevertheless, because of the several other reasons explicated *supra*, defendant is entitled to the grant of its motion for summary judgment. Accordingly, that motion is hereby granted. It is so ordered.